STATE BANK OF FARGO, a North Dakota State Banking Association, Plaintiff,

v.

The MERCHANTS NATIONAL BANK AND TRUST COMPANY OF FARGO, a National Banking Association, and John G. Heimann, Comptroller of the Currency, Defendants.

Civ. No. A3–76–9.

United States District Court, D. North Dakota, Southeastern Division.

May 31, 1978.

Norman G. Tenneson, Tenneson, Serkland, Lundberg & Erickson, Fargo, N. D., for plaintiff.

Frank J. Magill, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for Merchants.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for defendants; David A. Ranheim, of counsel.

James R. Britton, U. S. Atty., Fargo, N. D., for Comptroller.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

Plaintiff in the above-entitled action challenges the granting by defendant Comptroller of the Currency[1] (Comptroller) of branch certificates for the operation of two customer electronic funds transfer centers, otherwise known as customer bank communications terminals (CBCTs),[2] by de-

---

1. James E. Smith was named as defendant Comptroller of the Currency in plaintiff's complaint and amended complaint. The name of the present Comptroller, John G. Heimann, has been substituted pursuant to Rule 25(d)(1), F.R. Civ.P.

2. Customer bank communications terminals (CBCTs) can offer a variety of banking services. The following informative description appears in The Business Lawyer of the Section of Corporation, Banking and Business Law of the American Bar Association:

In general, CBCTs are mechanical or electronic machines or devices which bank customers are able to utilize to perform a number of banking transactions with respect to their own accounts, including: making deposits to checking or savings accounts; transferring funds among checking, savings, and credit card accounts, making cash withdrawals from existing checking or savings account balances; obtaining cash advances pursuant to prearranged lines of credit in conjunction with credit card or overdraft credit checking accounts; and making payments on obligations to the bank in question,

fendant The Merchants National Bank and Trust Company of Fargo (Merchants).[3] In the amended complaint, plaintiff alleges that the Comptroller's actions in granting the CBCT branch certificates were arbitrary, capricious, unlawful and "contrary to and in violation of 12 U.S.C. 36 and [were] not authorized or permitted by the provisions of Section 6–03–13.1 through 6–03–13.4 of the North Dakota Century Code." Plaintiff further alleges the CBCT operations of Merchants "have not been approved by the State Banking Board of North Dakota as required by" Section 6–03–02, subsection 8 of the North Dakota Century Code. In the prayer for relief, plaintiff seeks a declaration that the CBCT operations of Merchants are illegal, and an order nullifying the action of the Comptroller granting the CBCT branch certificates and enjoining the Comptroller from "authorizing branch certificates for" such CBCTs, and further enjoining Merchants from operating the two CBCTs in question. Jurisdiction is predicated upon 12 U.S.C. § 36, 5 U.S.C. §§ 701 et seq., and 28 U.S.C. § 1331.

The matter was before this court once before on defendants' motion to stay proceedings. That motion was granted, and the proceedings were stayed pending administrative action by the Comptroller on applications by Merchants for branch certificates authorizing operation of the CBCTs in question as branches.[4] CBCT branch certificates were issued on Merchants' applications in March of 1977. Subsequent to issuance of the CBCT branch certificates (and subsequent to the filing of the amended complaint), Merchants filed a motion for summary judgment pursuant to Rule 56(b), F.R.Civ.P., and the Comptroller filed a "motion to dismiss [Rule 12(b)(1), (6), F.R. Civ.P.] or, in the alternative, for summary judgment," under Rule 56(b). These motions, as well as a motion filed by the Comptroller for a protective order,[5] were argued at a hearing before the court and taken under advisement at the conclusion of the hearing.

The record before the court consists of the pleadings and motions (with supporting and resisting briefs and materials), certain discovery material, the complete administrative records compiled by the Comptroller on the two CBCT branch applications filed by Merchants and the record made at the hearing.

■ Under Rule 56(c), F.R.Civ.P., a moving party is entitled to summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that such party is entitled

---

whether on installment loans or credit card accounts, via checks or currency or by direct debiting of checking or savings accounts. Additionally, some CBCTs can be utilized by bank customers to initiate bill payments to third parties (*e.g.* utilities, retailers, etc.) from checking, savings or credit card accounts. These machines are of two types: Automated Teller Machines ("ATMs"), which are unmanned, customer operated devices, and Point-of-Sale ("POS") Terminals which are electronic cash registers operated by retail employees. Either type of CBCT may be "on-line" (*i.e.*, linked by electronic means directly to the computer center of a bank or a consortium of banks) or "off-line" (*i.e.*, not so linked).

Peck & McMahon, *Recent Federal Litigation Relating to Customer-Bank Communications Terminals ("CBCTs") and the McFadden Act,* 32 Bus.Lawyer 1657 n.3 (1977).

3. Subsequent to commencement of the instant lawsuit, defendant The Merchants National Bank and Trust Company of Fargo changed its name to First Bank of North Dakota (N.A.)— Fargo. The name change, along with name changes of four other national banks, was the subject of a separate lawsuit now on appeal to the Eighth Circuit Court of Appeals.

4. Merchants had been operating the CBCTs in question without branch certificates, pursuant to administrative regulations which were rescinded by the Comptroller on August 23, 1976 (41 Fed.Reg. 36,198).

5. The Comptroller's motion for protective order resulted from the service and filing by plaintiff on January 9, 1978, of a notice to take the Comptroller's deposition. In his motion the Comptroller seeks to avoid the taking of his deposition and to postpone any additional discovery in this action pending a determination by this court of his motion for summary judgment.

to a judgment as a matter of law. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). Only when " 'it is quite clear what the truth is [and] [that] no genuine issue remains for trial' " is summary judgment appropriate. *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 184 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977), *quoting Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944) (brackets in original). These summary judgment standards are applicable in actions wherein administrative action of the Comptroller is under review. *See Merchants & Planters Bank of Newport, Ark. v. Smith*, 516 F.2d 355 (8th Cir. 1975) (Per Curiam); *First Nat. Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1374 (8th Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975); *Bank of Commerce of Laredo v. City Nat. Bank of Laredo*, 484 F.2d 284, 289 (5th Cir. 1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974).

## I. The Record Before the Court and the Applicable Law

The Comptroller is the Chief Administrator of the Office of the Comptroller of the Currency, Department of the Treasury. He is charged with the administration of the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, and related statutes. As Comptroller, he has been granted authority by Congress to regulate certain activities of national banks, including authority to investigate and approve or disapprove applications to establish new national banks (12 U.S.C. §§ 26–27); to investigate and approve or disapprove applications by national banks to change their names (12 U.S.C. § 30); to supervise the operations of the national banking system through various procedures including periodic examinations (12 U.S.C. § 481); and to investigate and approve or disapprove applications by national banks to establish branches (12 U.S.C. § 36).

With respect to branch banking by national banks, 12 U.S.C. § 36 provides in part as follows:

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

\* \* \* \* \* \*

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . . .

\* \* \* \* \* \*

The effect of Section 36(c) is to incorporate into the National Bank Act the branching limitations of each state, insofar as branch banking by national banks located in the respective states is concerned.

Under North Dakota law, "branch" banking is not allowed except: (1) at a separate drive-in facility (N.D.Cent.Code §§ 6–03–13.1 through 6–03–13.4); (2) at paying and receiving stations (N.D.Cent.Code §§ 6–03–14 through 6–03–19); and (3) at customer electronic funds transfer centers, otherwise known as customer bank communications terminals (CBCTs) (N.D.Cent.Code § 6–03–02, subsection 8).[6] The North Dakota CBCT provision, involved in the branching dispute before the court, reads as follows:

Powers.—After an association [state banking association, as defined in N.D. Cent.Code § 6–01–02 (Supp.1977)] has

6. While providing conditions under which CBCTs will be allowed in North Dakota, § 6–03–02, subsection 8 specifically provides that a CBCT is not a "branch."

made and filed articles of association and an organization certificate, it shall become a body corporate, and as such, and in the name designated in the certificate, it, subject to section 6–03–01, shall have the power:

\* \* \* \* \* \*

8. To exercise, by its board of directors or duly authorized officers or agents subject to law, all such incidental powers as shall be necessary to carry on the business of banking, including: . . . providing services to its customers involving electronic transfer of funds to the same extent that other financial institutions chartered and regulated by an agency of the federal government are permitted to provide such services within this state. A bank which provides electronic funds transfer equipment and service to its customers, at premises separate from its main banking house or duly authorized paying and receiving station or facility approved by the state banking board, must make such equipment and service available for use by customers of any other bank upon the request of such other bank to share its use and the agreement of such other bank to share pro rata all costs incurred in connection with its installation and operation, and such electronic operations shall not be deemed to be the establishment of a branch, nor of a paying and receiving station, nor of a separate facility. Such electronic operations at premises separate from its banking house or duly authorized paying and receiving station or facility, shall be considered a customer electronic funds transfer center and may be established subject to rules and regulations that the state banking board shall adopt.

N.D.Cent.Code § 6–03–02, subsection 8. The "rules and regulations" for establishment of CBCTs by state banking associations were adopted by the State Banking Board on July 28, 1976, in N.D.Reg. 6–03–02(8), "Regulations For The Establishment of Customer Electronic Funds Transfer Centers." They provide in part as follows:

1. Pursuant to Section 6–03–02(8), North Dakota Century Code, the State Banking Board is prepared to authorize the establishment of customer electronic funds transfer centers by state-chartered banks.

\* \* \* \* \* \*

4. The criteria for approval of customer electronic funds transfer centers shall be whether or not the establishment of such centers would impair the applicant bank's capital structure. There will be no population or distance criteria applied to such centers.

5. A bank may receive and act upon communications from its customers transmitted through customer electronic funds transfer centers requesting the withdrawal of funds either from the customer's deposit account or from a previously authorized line of credit, or instructing the bank to receive funds to the credit of the customer's accounts or to transfer funds for the customer's benefit. The customer electronic funds transfer center may be established by the bank and operated by the customer or by a third party. In accordance with the customer's request or instruction and subject to verification by the bank, cash or checks may be received and cash may be dispensed at the location of the customer electronic funds transfer center. . . . Any transaction initiated at such customer electronic funds transfer center shall be subject to verification by the bank either by direct wire transmission or otherwise. A bank shall provide insurance protection under its bonding program for transactions involving such customer electronic funds transfer center.

6. A customer electronic funds transfer center may not be established, used or shared by a bank until 30 days after the bank has sent to the State Banking Board written application for the proposed establishment or use of such center. The application shall describe with regard to such center:

(a) The location;

(b) A general description of the area where located (e. g., shopping center, supermarket, department store, etc.) and the manner of installation at that location;

(c) The manner of operation, including whether the center is on direct line, or indirect by other procedures, and describing such procedures;

(d) The kinds of transactions that will be performed;

(e) Whether the center will be manned, and if so, by whose employees;

(f) The manufacturer of the equipment to be used and, if owned, the purchase price or, if leased, the lease terms and payments and the name of the lessor;

(g) Consumer protection procedures, including the disclosure of rights and liabilities of consumers and protection against wrongful or accidental disclosure of confidential information;

(h) The distance from the nearest banking house, paying and receiving station, or facility, and from the nearest similar center of the applicant bank;

(i) The distance from the nearest banking house, paying and receiving station, or facility, and the nearest similar center of another bank, and the name of such other bank or banks within the city or town in which the center is to be established;

(j) Insurance and the security provisions protecting the center and its users.

\* \* \* \* \* \*

9. Written notice must be given to the State Banking Board and to all sharing banks 30 days before changing any of the operations described in an application previously submitted pursuant to Paragraph 6.

\* \* \* \* \* \*

14. In order to facilitate sharing of customer electronic funds transfer centers, any bank intending to apply for authorization to establish such a center must, at least 30 days prior to establishing such center, give written notice of such intention to all banks in this state within a 50 mile radius of the proposed center.

15. In order to further facilitate sharing of customer electronic funds transfer centers, the following requirements and criteria shall apply:

(a) The establishing bank shall file a report with the State Banking Board of all costs of establishing the center and the projected costs of operation;

(b) Any bank which has received authority to operate, and is operating, such center or centers shall annually supply the State Banking Board with records of income and operational costs of such centers;

(c) The establishing bank shall be prohibited from requiring that other participating banks maintain an account with the establishing bank in order to share the customer electronic funds transfer center;

(d) Any bank may apply to join an existing customer electronic funds transfer center at anytime upon compliance with the provisions of these regulations;

(e) The pro rata costs of the initial installation and the first year of operation of a customer electronic funds transfer center shall be determined by the respective sizes of the participating banks, based upon deposits at the end of the prior fiscal year. The pro rata costs for subsequent years shall be determined by the relative number of transactions handled for each bank sharing the center.

To enable the Office of the Comptroller of the Currency to effectively carry out its duties in supervising and regulating the activities of national banks, including those

relating to branch banking by national banks, the Comptroller has promulgated certain regulations which govern administrative procedures utilized by his office in processing matters concerning national banks. The regulations applicable to CBCT branch applications are found at 12 C.F.R. §§ 4.5a, 5.1, 5.2a, 5.4a and 8.3.[7]

In applications dated November 22, 1976, Merchants applied to the Comptroller for permission to operate five CBCT branches within the City of Fargo, North Dakota, where Merchants' main banking house is situated. The two CBCT branches at issue in this lawsuit were to be located at Hornbacher's Foods, 25th Avenue North and Broadway, and Piggly Wiggly Store, 32nd Avenue North and Broadway, respectively. Portions of the form applications[8] filed by Merchants required the applicant bank to set forth in detail the operational aspects of the proposed CBCT branches, any agreements entered into by the applicant relating to operation of the proposed CBCTs, the applicant bank's capital position, and the various banking functions which applicant intended to perform at the CBCT branches. With respect to functions, the two applications filed by Merchants provided as follows:

| Yes | No | |
|-----|-----|---|
| X | | Do you allow the CBCT to provide cash withdrawals from checking accounts? |
| X | | Do you allow the CBCT to provide cash withdrawals from savings accounts? |
| | X | Do you allow the CBCT to provide cash withdrawals from prearranged credit lines? |
| X | | Do you allow the CBCT to accept deposits to checking accounts? |
| X | | Do you allow the CBCT to accept deposits to savings accounts? |
| X | | Do you allow the CBCT to accept funds transfer from checking to savings? |
| X | | Do you allow the CBCT to accept funds transfer from savings to checking? |
| | X | Do you allow the CBCT to accept funds transfer from credit line to deposit accounts? |
| | X | Do you allow the CBCT to accept payments by deducting from a depository account? |
| | X | Do you allow the CBCT to accept payments by enclosed check or cash? |
| | X | Do you allow customer account inquiry?[9] |

7. These CBCT branching regulations were promulgated October 28, 1976, effective November 3, 1976 (41 Fed.Reg. 48,334).

8. The form applications were presumably furnished to Merchants by the Regional Administrator, Ninth National Bank Region, pursuant to 12 C.F.R. § 4.5a.

9. From the record before the court, it appears there is confusion or misunderstanding on the part of Merchants and its representatives as to: (1) what constitutes the withdrawal or transfer of funds at a CBCT involving prearranged credit lines; (2) whether the two CBCTs in issue are capable of providing withdrawal or transfer of funds from prearranged credit line services to CBCT customers; and (3) whether and to what extent customer account inquiries can be made at Merchants' CBCTs. In a letter from the president of Merchants to the Comptroller dated October 14, 1975, the bank president stated:

*Kinds of Transactions Performed*: Deposits and withdrawals to demand deposit and savings accounts, transfers between said accounts, and check verification transactions. . . .

This is substantially the same description included in Merchants' CBCT branch applications, with the exception of the check verification language. (The letter quoted from was in reference to two of Merchants' five CBCTs, only one of which is involved herein. A second letter from Merchants' president to the Comptroller dated June 1, 1976, included the identical description of "transactions performed" with reference to the three other CBCTs operated by Merchants.) However, in a letter dated December 8, 1975, from Russell H. Slotten, vice-president and marketing officer at Merchants, to Dean O. Wegenast of State Bank of Fargo (plaintiff), the following were listed among "services offered" at Merchants' CBCT "terminals":

\* \* \* \* \* \*

—Withdraw funds from checking and savings, or from a previously authorized line of credit.

—Allow the merchant to verify that sufficient funds exist in a customer's checking account to cover a check presented for cash or goods.

Finally, in answers to plaintiff's interrogatories filed July 1, 1976, Merchants states with reference to overdraft checking services offered at the Hornbacher's CBCT:

Merchants complied with the Comptroller's published procedural requirements governing applications for CBCT branches, and on November 24 or 25, 1976, published the notice required by 12 C.F.R. § 5.2a in *The Forum*, a daily newspaper of general circulation published in Fargo, North Dakota. Subsequent to publication of notice, two letters of protest were received by the Regional Administrator of National Banks, one from the executive vice-president of plaintiff bank and another from the Executive Secretary of the Independent Community Banks of North Dakota. Both protestants questioned the legality of the proposed CBCT branches, and State Bank of Fargo also asserted that the two CBCTs involved in the instant lawsuit would not serve the needs of the public, since they were to be located in the area currently served by State Bank of Fargo. In its letter, State Bank of Fargo (plaintiff) requested a hearing.[10]

The Regional Administrator responded by letters to both protestants, dated December 30, 1976. In these letters, the Regional Administrator acknowledged receipt of the protests, and informed the protestants that published administrative regulations "do not provide for hearing on such applications [CBCT branch applications] except in the sole discretion of the Comptroller."[11] The Regional Administrator's letters further informed protestants:

> We would be pleased to visit with you in this office concerning these applications or to receive further correspondence in this regard by no later than January 21 [, 1976].[12]

Merchants' CBCT branch applications were thereafter reviewed by the Regional Administrator of National Banks, the Acting Regional Director for Corporate Activities, and the First Deputy Comptroller, each of whom recommended approval of the applications.[13]

---

A bank customer may initiate a transaction at the terminal that could ultimately activate the customer's "checking plus account." However, this transaction cannot be considered the receipt of an "instant loan."

**10.** The protest letter sent on behalf of plaintiff bank is dated November 30, 1976. It states in part:

> \* \* \* \* \* \*
>
> The State Bank of Fargo does hereby protest these applications [for CBCT branch authorization for the two CBCTs involved herein] and the other applications for CBCT branches made by Merchants National Bank and Trust Company and requests a hearing to explain in detail our reasons why the applications should be denied.
>
> The applications for the CBCT branches should be denied for the following reasons, among others:
>
> 1. The CBCT branches at those locations do not serve the convenience, needs and welfare of the people of the community and area sought to be served as they are now served by our bank.
>
> 2. The State Bank of Fargo would also be seriously injured by the approval of the applications.
>
> 3. 12 U.S.C. 36(c) limits a national bank in establishing branches to areas where "no bank is located and doing business in the place where the proposed agency is to be located." State Bank of Fargo is presently

located and doing business where Merchants National Bank seeks to establish branches.

\* \* \* \* \* \*

The protest letter from the Executive Secretary of the Independent Community Banks of North Dakota does not appear in the administrative record compiled by the Comptroller on Merchants' CBCT branch applications, nor does it appear in the numerous filings in the court's file. Correspondence in the Comptroller's administrative record indicates the Independent Community Bank letter was dated December 14, 1976.

**11.** *See* 12 C.F.R. §§ 5.1, *et seq.* (Part 5).

**12.** At some point after December 30, 1976, and prior to the Comptroller's approval of Merchants' CBCT branch applications, the executive vice-president of plaintiff bank met with a member of the Regional Administrator's staff in the Minneapolis, Minnesota regional office, presumably to discuss the grounds of plaintiff's protest.

**13.** In a memorandum in the administrative record signed by these members of the Comptroller's staff, the protests submitted to the Regional Administrator are noted. With respect to the question as to the legality of Merchants' proposed CBCT branches, reliance is placed on a legal memorandum of the Regional Counsel for the Ninth National Bank Region, dated December 13, 1976, wherein the Regional Counsel concludes that CBCT branches can be legally established in the State of North Dakota. Inso-

On March 24, 1977, the Comptroller approved Merchants' CBCT branch applications,[14] and issued certificates for their operation. Commencing on that date, Merchants has been operating its "FAST-BANK" units as CBCT branches at the locations approved by the Comptroller.

On August 19, 1977, pursuant to stipulation, plaintiff filed its amended complaint.[15]

## II. Conclusions of Law and Rationale

The court has jurisdiction over the subject matter of this lawsuit, and personal jurisdiction over the parties.

■ The CBCT units at issue herein currently being operated by Merchants under branch certificates issued by the Comptroller are "branches" for purposes of 12 U.S.C. § 36. *State of Missouri ex rel. Kostman v. First Nat. Bank*, 538 F.2d 219 (8th Cir.), *cert. denied*, 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976); *Independent Bankers Ass'n of America v. Smith*, 175 U.S.App. D.C. 184, 534 F.2d 921, *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 14 (1976).

■ Plaintiff has standing, based on the allegations in its amended complaint, to contest in this court the decision of the Comptroller approving the CBCT branch applications for the two CBCT branches involved. *See Dakota Nat. Bank & Trust Co. v. First Nat. Bank*, 414 F.Supp. 1161, 1163 (D.N.D.1976), *rev'd on other grounds*, 554 F.2d 345 (8th Cir. 1977), *cert. denied*, 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157.

■ A national bank located in North Dakota need not obtain the approval of the North Dakota State Banking Board in order to operate a branch bank. National banks are creatures of Congress, and, under the National Bank Act the Comptroller is charged with their regulation and supervision. 12 U.S.C. §§ 21 *et seq.* Specifically with respect to branch banking, 12 U.S.C. § 36 allows national banks to establish and operate branches *with the approval of the Comptroller. First Nat. Bank of Fairbanks v. Camp*, 151 U.S.App.D.C. 1, 10–12, 465 F.2d 586, 595–97 (1972), *cert. denied*, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973).

The National Bank Act provision providing for the establishment and operation of new branches, set out previously,[16] "incorporate[s] by reference the limitations which state law places on branch banking activities by state banks." *First Nat. Bank v. Dickinson*, 396 U.S. 122, 131, 90 S.Ct. 337, 342, 24 L.Ed.2d 312 (1969), *rehearing denied*, 396 U.S. 1047, 90 S.Ct. 677, 24 L.Ed.2d 693 (1970). In the context of the instant controversy, the North Dakota branching law is found in N.D.Cent. Code § 6–03–02, subsection 8,[17] which provides for the operation by state banks of CBCTs (labeled in the statute as "customer electronic funds transfer centers").[18] The limitations of Section 6–03–02, subsection 8, are applicable to CBCT branch banking by national banks pursuant to 12 U.S.C. § 36(c).

far as State Bank of Fargo's assertion concerning "public needs," the staff memorandum includes the following:

The State Bank of Fargo's comment that the public needs will not be better served by the CBCTs is felt to be a matter of competition, and this segment of the protest is considered without merit.

14. At the time the Comptroller approved Merchants' CBCT branch applications, federal savings and loans were permitted to provide CBCT (RSU) services by the Federal Home Loan Bank Board (12 C.F.R. § 545.4–2) (provision terminated December 31, 1977), and federal credit unions were permitted by the National Credit Union Administration to provide CBCT (RSU) services (12 C.F.R. § 721.3).

15. In the amended complaint, plaintiff does not contend that Merchants' applications for CBCT

branch certificates were not processed according to published administrative regulations, nor does plaintiff contend that Merchants, in the operation of its CBCT branches, does not meet capitalization requirements established by statute or regulation, either state or federal.

16. 12 U.S.C. § 36(c).

17. The relevant portion of N.D.Cent. Code § 6–03–02, subsection 8, is set forth previously.

18. Under N.D.Cent. Code § 6–09–34, the Bank of North Dakota is also authorized to establish and operate CBCTs. However, the branching powers given to "the unusual Bank of North Dakota," an agency of a "sovereign power," provide no basis for a national bank to branch under 12 U.S.C. § 36(c). *Dakota Nat. Bank & Trust Co. v. First Nat. Bank*, 554 F.2d at 355–56.

■ The Comptroller is not required to consider the convenience, needs and welfare of the people of the community and area served when reviewing an application by a national bank to establish and operate a CBCT branch in North Dakota, nor is he required to consider whether other banks will be seriously injured by the approval of the application, each of which he is required to consider when reviewing a national bank's application to establish and operate a *separate drive-in facility* in North Dakota. N.D.Cent.Code §§ 6–03–13.1 through 6–03–13.4.[19]

■ The Comptroller is not required by statute or by published regulation to hold a hearing on the record or to make formal findings when passing on applications for CBCT branch certificates. 12 U.S.C. § 36; 12 C.F.R. §§ 5.1, *et seq.* (Part 5). *See First Bank and Trust Co. v. Smith,* 509 F.2d 663, 665 (1st Cir. 1975); *Merchants & Planters Bank of Newport, Ark. v. Smith,* 380 F.Supp. 354, 361 (E.D.Ark.1974), *aff'd,* 516 F.2d 355 (8th Cir. 1975) (Per Curiam). *Cf. Camp v. Pitts,* 411 U.S. 138, 140, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (Per Curiam). *But see Hempstead Bank v. Smith,* 540 F.2d 57, 60 (2nd Cir. 1976). It is sufficient if the administrative record shows the basis upon which the agency action was taken to such an extent as "to permit a court to apply to the action the proper standard of review." *Merchants & Planters Bank of Newport, Ark. v. Smith,* 380 F.Supp. at 361.

A. *Standard of Review*

The standard of this court's review of the Comptroller's decision is set forth in the Administrative Procedure Act:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret . . . statutory provisions, and

determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> \* \* \* \* \* \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> \* \* \* \* \* \*

5 U.S.C. § 706(2)(A).

■ Section 706(2)(A)'s "arbitrary and capricious standard" is applicable to review of the Comptroller's findings of fact. *Dakota Nat. Bank & Trust Co. v. First Nat. Bank,* 554 F.2d at 350 n.2. In those situations in which the Comptroller is not required to issue formal findings of fact, such as the case at bar, the court "must review the evidence . . . and determine whether the administrative action was arbitrary and capricious." *First Nat. Bank of Fayetteville v. Smith,* 508 F.2d at 1374. In *Camp v. Pitts,* the Supreme Court discussed Section 706(2)(A) and the function of the reviewing court in the context of a challenge to the Comptroller's decision denying an application to establish a new national bank:

> Unquestionably, the Comptroller's action is subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701. See *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 156–158 [90 S.Ct. 827, 831–832, 25 L.Ed.2d 184] (1970). But it is also clear that neither the National Bank Act nor the APA requires the Comptroller to hold a hearing or to make formal findings on the hearing record when passing on applications for new banking authorities. See 12 U.S.C. § 26; 5 U.S.C.

---

**19.** North Dakota's CBCT statute provides that CBCTs operated at premises separate from a bank's main banking house or duly authorized paying and receiving station or facility "shall not be deemed to be the establishment of a . . . . paying and receiving station, nor of a separate facility." N.D.Cent. Code § 6–03–02, subsection 8. Thus, North Dakota Century

Code provisions with respect to separate drive-in facilities (N.D.Cent. Code §§ 6–03–13.1 through 6–03–13.4) and paying and receiving stations (N.D.Cent. Code §§ 6–03–14 through 6–03–19) are not applicable to CBCTs established and operated pursuant to Section 6–03–02, subsection 8.

§ 557. Accordingly, the proper standard for judicial review of the Comptroller's adjudication is not the "substantial evidence" test which is appropriate when reviewing findings made on a hearing record, 5 U.S.C. § 706(2)(E). Nor was the reviewing court free to hold a *de novo* hearing under § 706(2)(F) and thereafter determine whether the agency action was "unwarranted by the facts." It is quite plain from our decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, [91 S.Ct. 814, 28 L.Ed.2d 136] (1971), that *de novo* review is appropriate only where there are inadequate fact-finding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions. *Id.*, at 415 [91 S.Ct. [814] at 823]. Neither situation applies here. The proceeding in the District Court was obviously not brought to enforce the Comptroller's decision, and the only deficiency suggested in agency action or proceedings is that the Comptroller inadequately explained his decision. As *Overton Park* demonstrates, however, that failure, if it occurred in this case, is not a deficiency in fact-finding procedures such as to warrant the *de novo* hearing ordered in this case.

The appropriate standard for review was, accordingly, whether the Comptroller's adjudication was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified in 5 U.S.C. § 706(2)(A). In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court. 411 U.S. at 140–42, 93 S.Ct. at 1243–1244 (footnote omitted).

In *First Nat. Bank of Fayetteville v. Smith*, which also involved a dispute as to the chartering of a new national bank, the Eighth Circuit Court of Appeals stated:

The "arbitrary and capricious" standard of review is a narrow one. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. 814. Its scope is more restrictive than the "substantial evidence" test which is applied when reviewing formal findings made on a hearing record. *See Camp v. Pitts, supra*, 411 U.S. at 141, 93 S.Ct. 1241; *Webster Groves Trust Co. v. Saxon* [370 F.2d 381 (8th Cir. 1966)], *supra*, 370 F.2d at 387; *Charlton v. United States*, 412 F.2d 390, 398 (3d Cir. 1969) (Stahl, Circuit Judge, concurring). "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." *Carlisle Paper Box Co. v. N. L. R. B.*, 398 F.2d 1, 6 (3d Cir. 1968). Something more than mere error is necessary to meet the test. *N. L. R. B. v. Parkhurst Manufacturing Co.*, 317 F.2d 513, 518 (8th Cir. 1963). To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case * *." 73 C.J.S. Public Administrative Bodies and Procedure § 209 at 569 (1951).

\* \* \* \* \* \*

It is well established that in rendering a decision on the basis of such an administrative record the reviewing "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 824.[14] *See also Webster Groves Trust v. Saxon, supra; Sterling National Bank of Davie v. Camp*, 431 F.2d 514 (5th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971).

\* \* \* \* \* \*

It is undisputed that neither the National Bank Act nor the Administrative Procedure Act requires the Comptroller to make formal findings on a hearing record. *Camp v. Pitts, supra; Webster Groves Trust Co. v. Saxon, supra; Sterling National Bank of Davie v. Camp, supra*. This is so because the function of the hearing panel in such cases is that of a "fact-gathering organ" rather than a fact-finder. *First National Bank of Fairbanks v. Camp*, 151 U.S.App.D.C. 1, [19,]

465 F.2d 586, 604 (1972), cert. denied, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973); *First Citizens Bank and Trust Co. v. Camp*, 409 F.2d 1086, 1090 (4th Cir. 1969). . . .
508 F.2d at 1376, 1378–79.[20]

■ The legal issues resolved by the Comptroller and presented to this court in this action are to be examined *de novo*.[21] *Dakota Nat. Bank & Trust Co. v. First Nat. Bank*, 554 F.2d at 350–51.

## B. *North Dakota CBCT Banking*

■ There has been no authoritative interpretation of North Dakota's CBCT statute, N.D.Cent.Code § 6–03–02, subsection 8, by the North Dakota Supreme Court. There are, however, "administrative regulations which expand the statutory provision"[22] which provide some guidance to the court,[23] as well as available extrinsic aids including the legislative history of Section 6–03–02, subsection 8, to aid the court in determining the limitations on CBCT banking in North Dakota.

The North Dakota CBCT provision is premised on actual or potential CBCT utilization by federally-chartered financial institutions in the State of North Dakota. Because the statute does not constitute an outright grant of authority for state banks to establish and operate CBCTs, but instead makes reference in a general way to "other financial institutions chartered and regulated by an agency of the federal government" which are permitted to provide CBCT services in North Dakota, a definition of the phrase relating to federally-chartered financial institutions is essential in determining state CBCT banking limitations. The phrase is not defined in Title 6 of the North Dakota Century Code, nor is the term "financial institution" defined therein.[24] Thus, the court must look to available extrinsic aids, including the legislative history of Section 6–03–02, subsection 8, in order to define it.[25]

---

**20.** In a footnote, n.14 indicated in the quoted material above, the Eighth Circuit noted:

This rule has evolved in recognition of the administrator's expertise in dealing with certain kinds of problems and in deference to the broad discretion conferred on him by statute and regulation.

508 F.2d at 1378 (citations omitted).

**21.** In acting on Merchants' applications for CBCT branch certificates, the Comptroller was not required to, and did not, issue a formal opinion incorporating findings of fact or conclusions of law. However, necessarily implicit in his grant of approval for Merchants' CBCT branches is a determination of certain legal issues, which issues plaintiff now presents to this court.

**22.** *Dakota Nat. Bank & Trust Co. v. First Nat. Bank*, 554 F.2d at 354. *See also Nebraskans for Ind. Banking v. Omaha Nat. Bank*, 530 F.2d 755, 760–63 (8th Cir.), *vacated and remanded on other grounds*, 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976).

**23.** N.D.Reg. 6–03–02(8), "Regulations for the Establishment of Customer Electronic Funds Transfer Centers."

See N.D.Cent.Code § 28–32–03 (Supp.1977) with respect to the legal effect of a properly-adopted state agency regulation.

**24.** The term "financial institution" does appear in other provisions of Title 6, *see, e. g.,* N.D. Cent.Code §§ 6–01–01, 6–01–09 (Supp.1977), but not with reference to *federal* financial institutions.

**25.** The instant lawsuit is not a diversity action under 28 U.S.C. § 1332; nevertheless, the court is confronted with an issue of statutory construction involving a state statute which controls CBCT banking by state banks and, in turn, CBCT branch banking by national banks. Under these circumstances the court deems the applicable standards of statutory construction to be those established by the North Dakota Supreme Court.

Under North Dakota case law, extrinsic aids such as the legislative history of an act may be resorted to in aid of construction only when the statute involved is ambiguous; " '[w]here the language of a statute is plain and unambiguous, there is no occasion for construction, . . .' " *Rausch v. Nelson*, 134 N.W.2d 519, 525 (N.D. 1965), *quoting* 82 C.J.S. Statutes § 322 (1953). *See also Olheiser v. Anneo., Inc.*, 219 N.W.2d 116, 118 (N.D.1974); *Monson v. Nelson*, 145 N.W.2d 892, 898 (N.D.1966). The presence of the ambiguous language with reference to other federally-regulated financial institutions in Section 6–03–02, subsection 8, makes this an appropriate occasion for construction.

Extrinsic aids helpful in statutory construction include the legislative history of the measure during the period from its introduction in the legislature to its enactment. *Rausch v. Nelson*, 134 N.W.2d at 523. Events during this period of time indicative of the intent of the

North Dakota has traditionally not permitted extensive "branching" by its banks, in whatever mode a "branch" may take. *See Dakota Nat. Bank & Trust Co. v. First Nat. Bank,* 554 F.2d at 354. The language of its CBCT statute reflects this tradition— on the one hand, the language of the CBCT provision is indicative of a legislative reluctance to authorize CBCT utilization by state banks on a wide-open scale, and on the other hand it indicates an intent to grant to state banks the same rights with respect to CBCT banking as enjoyed by other federally-regulated financial institutions within North Dakota.

The CBCT statute was enacted in 1975 in apparent response to the actual or potential utilization of CBCTs by certain federally-regulated institutions within North Dakota. At that time at least three different federal agencies permitted CBCT (or similar facility) utilization by their regulated financial institutions within North Dakota: (1) the Federal Home Loan Bank Board, 12 C.F.R. § 545.4–2 (savings and loan associations) (provision terminated December 31, 1977); (2) the National Credit Union Administration, 12 C.F.R. § 721.3 (credit unions) (a "temporary provision"); and (3) the Comptroller of the Currency, 12 C.F.R. § 7.7491 (national banks) (rescinded August 23, 1976

(41 Fed.Reg. 36,198)).[26] The regulations authorizing CBCT (or similar facility) utilization by federal savings and loan associations, federal credit unions and national banks were all promulgated by the respective agencies in 1974.

The House and Senate Journals of the 1975 session of the State Legislature provide little in the way of evidence of legislative intent in the enactment of Senate Bill No. 2443, which became N.D.Cent.Code § 6–03–02, subsection 8. However, the available tangible evidence of legislative intent, Minutes of Senate Committee on Industry, Business and Labor, Forty-fourth Session of the Legislative Assembly of North Dakota, on Senate Bill No. 2443 (minutes of hearings held February 18, 1975, March 4, 1975, March 12, 1975),[27] as well as the circumstances surrounding the enactment of Senate Bill No. 2443, *i. e.,* the allowable federal financial institution use of CBCTs, and the reference in the statute to such use, all are indicative of an intent on the part of the legislature to keep state banks abreast of *all* federal financial institutions in the field of CBCT banking. This would include so-called "thrift institutions" regulated by federal agencies (savings and loan associations, credit unions) as well as national banks.[28]

legislature consist chiefly of " 'statements by various parties as to the nature and effect of the proposed law and statements or other evidence as to evils requiring legislative relief.' " *Id., quoting* 2 Sutherland, Statutory Construction § 5003, at 484–85 (3d ed. Horack 1943). The legislative purpose or reason which prompted enactment of an act, the policy or object intended to be accomplished, the historical background and other related laws and circumstances all may provide guidance as to the proper construction of an ambiguous provision. *See State v. Jelliff,* 251 N.W.2d 1, 7 (N.D.1977); *Hughes v. State Farm Mut. Auto. Ins. Co.,* 236 N.W.2d 870, 882 (N.D.1975); *Beck v. Workmen's Compensation Bureau,* 141 N.W.2d 784, 787 (N.D.1966); *Coulter v. Ramberg,* 79 N.D. 208, 55 N.W.2d 516, 519 (1952); *Ophaug v. Hildre,* 77 N.D. 221, 42 N.W.2d 438, 440 (1950).

See generally 2A Sutherland, Statutory Construction §§ 48.01 *et seq.* (4th ed. Sands 1973).

**26.** The Comptroller's regulation authorizing national bank CBCTs without regard to state branching restrictions was rescinded pursuant to *Independent Bankers Ass'n of America v.*

*Smith,* 534 F.2d 921 (D.C.Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976).

**27.** With respect to the use of legislative committee minutes as a source of information relative to legislative intent, see *Hughes v. State Farm Mut. Auto. Ins. Co.,* 236 N.W.2d at 876, 878–79 n.3, 4; *Rausch v. Nelson,* 134 N.W.2d at 523.

**28.** There is nothing in Section 6–03–02, subsection 8, which would indicate that the legislature, in including the phrase "other financial institutions chartered and regulated by an agency of the federal government" in the statute, was making reference solely to national banks. In those provisions of Title 6 of the North Dakota Century Code wherein reference is made to national banks, the reference is specific—the term "national bank" or "national banking association" or a similar term is used. *See, e. g.,* N.D.Cent.Code §§ 6–01–02, 6–01–03, 6–02–01 (Supp.1977), 6–03–11, 6–03–13, 6–03–13.1, 6–03–13.4, 6–03–13.5, 6–05–02, 6–05.1–01 (Supp.1977), 6–05.1–05 (Supp.1977), 6–08–27.

By its terms, Section 6–03–02, subsection 8 allows a state bank to

provid[e] services to its customers involving electronic transfer of funds to the same extent that other financial institutions chartered and regulated by an agency of the federal government are permitted to provide such services within this state. . . . Such electronic operations at premises separate from its banking house or duly authorized paying and receiving station or facility . . . may be established subject to rules and regulations that the state banking board shall adopt.

The relevant regulations promulgated by the North Dakota State Banking Board have been set out previously.

The court concludes that under the terms of Section 6–03–02, subsection 8, and N.D.Reg. 6–03–02(8), and in light of the legislative history and circumstances surrounding the enactment of North Dakota's CBCT statute, a state bank in this state can utilize off-premises[29] CBCTs: (a) if there are "other financial institutions chartered and regulated by an agency of the federal government" located within the State of North Dakota (this includes federally-chartered savings and loan associations and credit unions); (b) which are "permitted" by the appropriate federal regulating agency "to provide" CBCT services in North Dakota; and (c) subject to the provisions of N.D.Reg. 6–03–02(8).

## C. CBCT Branch Banking by National Banks in North Dakota

The branch banking provision of the National Bank Act, 12 U.S.C. § 36(c), is set forth previously. On its face, Section 36(c) appears to set forth two different standards applicable to branching activities by national banks: (1) a standard to be applied to a proposed branch within the limits of the city, town or village in which the applicant national bank is situated:

if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question;

and (2) a standard to be applied to a proposed branch "at any point within the State" in which the applicant national bank is situated:

if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

. . .

Nevertheless, courts faced with a question involving branch banking by a national bank have focused more on "when, where, and how state law would authorize a state bank to establish and operate such a branch," *St. Louis Cty. Nat. Bank v. Mercantile Trusts, Etc.*, 548 F.2d 716, 717 (8th Cir. 1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2975, 53 L.Ed.2d 1093, rather than on whether the state branching law involved is "express," "specific," "affirmative" or the like. Especially is this focus evident in recent Eighth Circuit opinions, where the principal inquiry under 12 U.S.C. § 36(c) seems to be whether or not a state bank would be permitted to establish and maintain a branch such as that proposed by the national bank involved. *See Dakota Nat. Bank & Trust Co. v. First Nat. Bank*, 554 F.2d at 353–54; *St. Louis Cty. Nat. Bank v. Mercantile Trust, Etc.*, 548 F.2d at 717–18; *State of Missouri ex rel. Kostman v. First Nat. Bank*, 538 F.2d at 219; *Nebraskans for Ind. Banking v. Omaha Nat. Bank*, 530 F.2d at 759–60; *Driscoll v. Northwestern Nat. Bank of St. Paul*, 484 F.2d 173, 175 (8th Cir. 1973); *Merchants & Planters Bank of Newport, Ark. v. Smith*, 380 F.Supp. at 357, *aff'd*, 516 F.2d 355 (Per Curiam). *See also Independent Bankers Ass'n of America v.*

29. "Off-premises" means at a place "separate from [a bank's] main banking house or duly authorized paying and receiving station or [separate drive-in] facility . . . ." N.D. Cent.Code § 6–03–02, subsection 8.

*Smith,* 175 U.S.App.D.C. at 211–12, 534 F.2d at 948–49.[30]

The parties to the instant action have raised the issues of: (1) which of the two standards of 12 U.S.C. § 36(c) is applicable herein, and (2) whether the North Dakota CBCT provision qualifies under the appropriate standard.

▨▨▨ In view of the fact that the two CBCT branches at issue are both located within the City of Fargo, North Dakota, and that Merchants is situated within the City of Fargo, the court concludes the first standard discussed, set out in 12 U.S.C. § 36(c)(1), is applicable to the instant controversy. The court further concludes that the North Dakota statutory authority for CBCT banking by state banks qualifies under that standard as well as the second standard, set out in 12 U.S.C. § 36(c)(2), and thus provides authority for CBCT branching by national banks.

A national bank located in North Dakota can establish and operate off-premises CBCTs: (a) with the approval of the Comptroller (12 U.S.C. § 36(c)) and pursuant to branch requirements set forth in federal statutes and regulations; (b) if there are "other financial institutions chartered and regulated by an agency of the federal government" located within the State of North Dakota (this includes federally-chartered savings and loan associations and credit unions; it does *not* include other national banks); (c) which are "permitted" by the appropriate federal regulating agency "to provide" CBCT services in North Dakota; and (d) subject to the provisions of N.D.Reg. 6–03–02(8).[31]

### D. *Other Federal Financial Institutions Permitted to Provide CBCT Services*

Under current regulations, federally-chartered credit unions in North Dakota[32] are permitted by the National Credit Union Administration to operate CBCTs (referred to as remote service units or RSUs) without regard to state branching restrictions. 12 C.F.R. § 721.3.[33]

---

**30.** A few courts appear to distinguish 12 U.S.C. § 36(c)(1) from (2). *See, e. g., First Bank and Trust Co. v. Smith,* 509 F.2d 663 (1st Cir. 1975); *Seattle Trust & Savings Bank v. Bank of California, N. A.,* 492 F.2d 48 (9th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); *Howell v. Citizens First Nat. Bank of Ridgewood,* 385 F.2d 528 (3rd Cir. 1967).

**31.** As noted previously, a national bank, being under the supervision of the Comptroller, is not required to obtain the approval of the North Dakota State Banking Board in order to operate CBCTs in North Dakota. However, those provisions of N.D.Reg. 6–03–02(8) which otherwise govern when, where, and how a CBCT may be established and operated *are* applicable to CBCT branching by national banks in North Dakota. Thus, for example, reporting and notice requirements (requiring that information relating to CBCT operations be given the State Banking Board) and time limitations established in N.D.Reg. 6–03–02(8) are applicable to national banks. *Cf. First Nat. Bank v. Dickinson,* 396 U.S. at 133, 90 S.Ct. 337; *First Nat. Bank v. Walker Bank,* 385 U.S. 252, 261–62, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), *rehearing denied,* 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967).

In the case at bar, plaintiff does not contend that the State Banking Board has not been kept fully advised of Merchants' CBCT operations, or that other notice provisions of N.D.Reg. 6–03–02(8) have not been complied with. In view

of this, and in light of the record before the court, the court concludes the Comptroller and Merchants have demonstrated sufficient compliance with N.D.Reg. 6–03–02(8).

**32.** The court takes judicial notice of the presence and operation of federal credit unions within the State of North Dakota. *See* F.R. Evid., Rule 201(b), (c), (f).

**33.** 12 C.F.R. § 721.3, though labeled a "temporary provision," has been in effect since August 1974. 39 Fed.Reg. 30,107.

In addition to federal credit unions, it appears that the Federal Home Loan Bank Board may be presently permitting federal savings and loan associations to operate CBCTs (RSUs). The provisions of 12 C.F.R. § 545.4–2, "Remote service units (temporary provision)," under which federal savings and loan associations have been able to operate CBCTs since June 1974, were terminated automatically "at the close of December 31, 1977." 12 C.F.R. § 545.4–2(k). However, in the explanation accompanying a proposed *permanent* federal savings and loan RSU provision ("Proposed Amendments Regarding Electronic Fund Transfers Through Remote Service Units"), appearing at 43 Fed.Reg. 7,327, the Federal Home Loan Bank Board states:

It should be noted that the Board intends to allow *existing* operational projects a period of six months following the effective date of

The Comptroller, in approving Merchants' CBCT branch applications at issue herein, and Merchants, in operating its "FAST-BANK" units as CBCT branches under the Comptroller's authorization, have shown compliance with the applicable statutes and regulations, both state and federal.

██ The court concludes, on the basis of the administrative record as a whole, *First Nat. Bank of Fayetteville v. Smith*, 508 F.2d at 1375, that plaintiff has failed to meet its burden of showing the Comptroller's action in granting approval for Merchants' operation of the two CBCT branches at issue was arbitrary or capricious, or an abuse of the discretion vested in him by 12 U.S.C. § 36(c). The court further concludes the Comptroller's action was otherwise in accordance with law, and that Merchants is legally operating the two CBCT branches involved in this lawsuit.[34]

On the basis of the foregoing,

IT IS ORDERED the alternative motion of defendant Comptroller of the Currency to dismiss, pursuant to Rule 12(b)(1) and (6), is DENIED.

IT IS FURTHER ORDERED the motion of defendant The Merchants National Bank and Trust Company of Fargo for summary judgment, and the alternative motion of defendant Comptroller of the Currency for summary judgment, both pursuant to Rule 56(b), are GRANTED.

The Rule 26(c) motion for a protective order of defendant Comptroller is rendered moot.

IT IS FURTHER ORDERED that judgment dismissing plaintiff's action be entered.

---

this proposed regulation to conform to [amended portions of 12 C.F.R. § 545.4–2]. 43 Fed.Reg. 7,328 (emphasis added).

**34.** The issues noted previously regarding whether Merchants allows customers at its CBCT branches to consummate transactions involving prearranged lines of credit, and whether check verification constitutes customer account inquiry are not material in this action, since in any case state law allows them, and whether or not the Comptroller approves of such transactions under the branch certificates outstanding is a question to be put to the

Comptroller. The court notes in passing that in the extremely technical field of CBCT branch banking, a more detailed form application setting forth in detail exactly what types of transactions are possible at a particular CBCT would clarify some of the issues which the Comptroller must resolve before issuing a CBCT branch certificate, and which courts may be called upon to resolve in lawsuits such as the instant one. See discussion in *Independent Bankers Ass'n of America v. Smith*, 175 U.S. App.D.C. at 201–11, 534 F.2d at 938–48.