500 F.Supp. 1253 (1980)
MORSEMERE SAVINGS AND LOAN ASSOCIATION, Plaintiff,
and
Fort Lee Savings and Loan Association, Intervenor-Plaintiff,
v.
Garth MARSTON, Robert H. McKinney, The Federal Home Loan Bank Board and Community Federal Savings and Loan Association, Defendants.
No. Civ. 78-426.
United States District Court, D. New Jersey.
October 28, 1980.
Harkavy, Goldman, Goldman, Caprio & Levy by E. Robert Levy, East Orange, N.J., for Morsemere.
T. Robert Zochowski, Princeton-Junction, N.J., for Fort Lee Savings and Loan Association.
Harvey Simon, Associate Gen. Counsel (John E. Gunther, and Paul W. Grace, Trial Attys., Washington, D.C., with Milan C. Miskovsky, Gen. Counsel and Ralph W. Christy, Senior Associate Gen. Counsel, Washington, D.C., of counsel), for Federal Home Loan Bank Board and members.
Weber, Muth & Weber by Walter W. Weber, Jr., Ramsey, N.J., for Community Federal Savings and Loan Association.
BIUNNO, District Judge.
This action challenges a resolution of the Federal Home Loan Bank Board (Board) authorizing Community Federal S & L Ass'n (Community) to open a branch office at or in the immediate vicinity of 1365 Inwood Avenue, Fort Lee, N.J., dated November 30, 1977.
It is brought by Morsemere Savings and Loan Ass'n (Morsemere), a New Jersey chartered institution. Fort Lee Savings and Loan Ass'n (Fort Lee), as intervenor, also challenges the resolution. Both were protestants to Community's application. A third protestant, First Federal S & L Ass'n of Paterson (First Federal), is not a party to the present action in any capacity.
*1254 Although the complaint is cast in terms of a declaratory judgment suit, it is in fact an action seeking judicial review under the Administrative Procedure Act, 5 U.S.C. § 701, et seq. The scope of review is governed by 5 U.S.C. § 706(2).
Morsemere's challenge is grounded entirely on the proposition that it was deprived of a property right without due process of law.
Fort Lee's challenge joins in Morsemere's position without separate analysis or argument, and also asserts that the Board action is defective for failure to give reasons to support its findings that applicable criteria had been met.
The matter was presented for decision by means of defendants' motion for summary judgment, with briefs and oral argument heard October 14, 1980. Since the statutory review is on the basis of the administrative record, which has been supplied, the motion for "summary judgment" is actually no more than a convenient device for initiating the filing of briefs and hearing of oral argument, as though before an appellate court. This is because on a § 706 review, or other kinds of review where there is no trial de novo, such as under 42 U.S.C. § 405(g), the only "facts" in the case consist of the administrative record. Once that has been supplied, as it has been here, the court has all the pertinent facts before it and what remains is argument on the law in the light of that record.
At a hearing held March 30, 1978, the court did have before it fact presentations outside of, and later than, the agency record, and itself asked the parties for some external fact items. Those additional and subsequent items of fact were received and considered because the hearing was on Morsemere's application for a preliminary injunction to restrain Community from opening its branch for business, after having completed remodeling, in about 2 weeks. While essential for that hearing, those facts (outside the record) have no application at the present stage of the case and are not considered.
* * * * * *
[An elaborate and detailed review of the procedural history before the Board, as well as of the contents of Community's application, of the formal protests filed by Fort Lee, First Federal and Morsemere, and of the response by Community is omitted from publication. It has too little content value to be worth the permanent space it would occupy, and the remainder of the opinion adequately discloses the issues and the rationale for the decision.]
* * * * * *
The Oral Argument (Record, pp. 239-339)
The first item that came up at oral argument on the branch application was a reading into the record of the reply to Morsemere's letters received September 2. Record, pp. 244-245. It was also noted that two calls, on September 6 and September 7, had reported Morsemere's intention to file legal action, and then to suspend that step. Record, p. 246.
Morsemere then urged that the matter be stayed to allow time to apply to federal court requiring the Board to allow Morsemere to refer in argument to the documentation it had submitted. Record, pp. 246-248.
Community then summarized the highlights of its application, Record pp. 248-259.
The combined oral argument summarizing the protests of Fort Lee and First Federal followed, Record pp. 260-295.
Morsemere's argument opened by expressing the view that the area is healthy and viable, and that the site at Presidential Apartments and the Shoprite had very high volume. It believed the location needed, and would strongly support a savings and loan facility. It took no issue with viability and feasibility, viewing that as not a critical issue. Record, pp. 295-297. Rather, it viewed the issue to be whether it would support both Community and Morsemere, emphasizing that the latter would be a principal office, not merely a branch. It complained that it could not discuss its protest even though Community had said, in response, that if Morsemere opened it would take half the deposits. Record, pp. 297-298.
*1255 The agent noted that what would not be part of the file were the letters received September 2; that the fact of the existence of Morsemere was part of the file, and that argumentation on that aspect had been exchanged. Record, p. 298. Morsemere pressed that the additional facts reported in the recent letters should be considered (i. e., the obtaining of space and the transfer, without approval required, of the formerly approved location). Record, pp. 298-300. In fact, it was said that if Morsemere were unwilling to provide the new information, the agent had authority to request it under the express authority of the Regulations. Record, p. 301. The agent asked if Morsemere intended to argue the merits on Community's application, Record, p. 303, and after several pages, asked the question again, Record, p. 307, and Morsemere said "Yes", and the agent said "Proceed". The agent also observed that the Board was on administrative notice of the existence of an approved but unopened Morsemere facility in Fort Lee. Record, p. 307.
Argument by Morsemere then followed, on the thesis that Morsemere fully intended to proceed and now had space, despite earlier difficulties including opposition from Fort Lee. With this as a fact, Community would now be obliged to take a hard look at the situation since the application was premised on Morsemere's failure to open. The view was expressed that Community would suffer severely; there would be loss to Morsemere as well but not so severe as to cause a problem or cause it to lose its desire to open. Reference is made to Community's response, which uses half the deposits in the event Morsemere opened. Relative locations in respect to the parking areas are discussed. At the end, Morsemere expressed appreciation for having been allowed to make its presentation; it said it had been given the opportunity it wanted to make a full statement and give an explanation, recognizing that this precluded any procedural problem. Record, pp. 308-316.
Community then expressed surprise that Morsemere had been allowed to go into facts and events not covered by the filed presentation, and which it had understood would not be part of the record. It asked if the new data about the status of Morsemere's office would be available to and considered by the Board. The agent said: "The answer is yes and had it not been presented we would have requested it anyway". Record, p. 317.
In rebuttal, Community first asked if it would be provided an opportunity to submit figures based on Morsemere's actual presence, so they would be part of the record. It was told that the answer would be given at the end of the rebuttal. Record, pp. 317-318.
Community denied that its use, in the written response, of half the deposits originally projected was a concession that this would be the result. Rather, it was taken as a "worst case" example. Also, it asserted that its inquiry into space at Presidential Plaza carried no implication that it regarded that location as superior. It was merely a matter of having looked at all possibilities. Morsemere's statement that it could change the already approved location to another site without further (N.J.) review and approval was questioned. Also, Morsemere presented nothing about its space, or floor plan, or the lease, and the like. Record, pp. 318-323.
Mr. Mitchell then rebutted the protestants arguments, and concluded by observing that Mr. Perkins had estimated only $9 million in deposits after 3 years, and even taking that figure the office would be successful and feasible, thus eliminating any need for extra time to develop figures in respect to Morsemere. Record, pp. 323-326. There is also rebuttal on differences due to using a smaller PMA, different income figures, and other like points. Record, pp. 327-331. Community then concluded and left the matter in the hands of the Board, Record p. 331, lines 7-9.
After some further colloquy, the agent asked Morsemere for some information: the precise location of the leased space (for which a sketch was made); the size of the space (1,600 sq. ft.); it would have an office for the president and his secretary, a board room (which might be combined with the office), a teller's station, and a lounge area *1256 for employees; the mortgage department would be supervised from there but physically would remain where it is at 300 Broad Avenue; the audit department would remain at Broad Avenue; it expected to open before December 2; could Morsemere have the N.J. commissioner or authorized deputy supply a decision or a letter either approving the latest location change or stating that they had no objection to it. Record, pp. 332-337. [NOTE: The Board itself eventually wrote the N.J. Commissioner and received direct replies. Record, p. 334, p. 347, p. 349, p. 341].
The agent then asked Community to supply additional information, suggesting that the figures be based on deposits of about half what the budget would be without Morsemere. Record, p. 337.
The agent said that protestants could be provided with a copy. "However, there will be no response to this material. You understand that somebody has to speak last. We are asking for this information for our own purposes." Fort Lee, First Federal and Morsemere noted their objections. Record, pp. 338-339.

Judicial Review.
The pattern of the law in respect to federal judicial review of actions of administrative agencies in the Executive Branch is far from clear. This is no doubt due to the "case or controversy" boundaries for Article III courts, and to the wide variety of statutory provisions in respect to one or another agency under a large number of Acts of Congress.
At the common law, the prerogative writs of certiorari and mandamus, along with prohibition and procedendo, were considered to be always available when no other remedy was provided. Prerogative writ law, like equity law, provided means for access to the courts in such situations.
Since agencies of government can only act authoritatively when they act within the administrative powers established for them "by law", the writ of certiorari has traditionally been available in common law courts whenever no express remedy has been provided for the review of proceedings of a statutory body. See, e. g., Parker v. Griggs, 4 N.J.L. 182 (Sup.1818); Lawrence v. Dickey, 12 N.J.L. 368 (Sup.1831); State v. Shafer, 63 N.J.L. 182 (Sup.1899); Hisor v. Van Diver, 82 N.J.L. 303, 82 A. 526 (Sup. 1912).
The writ did not lie when there is another adequate and effective remedy provided. N. J. R. Co. v. Suydam, 17 N.J.L. 25 (Sup. 1839); Maguire v. Goldberger, 71 N.J.L. 173, 58 A. 167 (Sup.1904).
In the federal structure a pattern has developed for the establishment of what amount to three different kinds of judicial review pursuant to statute. The broadest form of review is that labelled as a "trial de novo". While the precedents are by no means clear or consistent, this form of review contemplates, at the least, that the reviewing court make its own determination of the facts on the basis of the agency record, and at the most that the reviewing court conduct a plenary trial as though there had been no agency proceeding at all. The United States Code discloses somewhat more than a dozen instances for which the Congress has provided by statute for judicial review by "trial de novo".
An intermediate level embraces matters for which the Congress has provided for judicial review, but has also directed that on review the agency action is to be sustained if supported in the agency record by "substantial evidence". Sometimes, as in 42 U.S.C. § 405(g), the phrasing is that the agency findings are to be "conclusive" if they are supported by "substantial evidence." In any event, whatever the phrasing, this category reflects an intention that while the review be penetrating and thorough, the judiciary is not to substitute its independent views or findings for those of the agency. For this category, the United States Code reflects more than 100 instances for which this level and scope of review is authorized.
The third and largest group consists of those agency actions for which the statute merely provides for judicial review, with no reference to "substantial evidence" or for "trial de novo". This is the largest group of all, encompassing several hundred instances, *1257 and comes closest to the nature of the common law writ of certiorari for matters where agency discretion and expertise are predominant. For this class, the modern trend of judicial expression has been to say that the action reviewed is to be sustained so long as there is "any rational basis" in the agency record to support it. The "rational basis" test, for this category of review, is evidently a positive form of expression which is the opposite of saying that the action under review was arbitrary, capricious or without foundation in law or fact, the review being from the record itself.
For the trial de novo, the agency record appears to be no more than one of the kinds of evidence the court may consider. See, for example, Chandler v. Roudebush, 425 U.S. 840, at 864, note 39, 96 S.Ct. 1949, at 1961, note 39, 48 L.Ed.2d 416 (1976), for Title VII actions, which are "trials de novo" even though the phrase is not in the Act. In both the other cases, the reviewing court is expected to make a thorough inspection of the agency record as a whole, and in some situations, as where the substantial evidence test applies, it must judge the determination on the basis of the reasons stated for the agency determination. See, Industrial Union v. Amer. Petrol. Inst., ___ U.S. ___ at ___, note 31, 100 S.Ct. 2844 at 2858, note 31, 65 L.Ed.2d 1010 at 1028, note 31 (1980).
The primary decision in this Circuit is Bridgeport Federal S & L v. Federal Home Loan Bank Board, 307 F.2d 580 (CA 3, 1962), affirming 199 F.Supp. 410 (D.Pa., 1961). That case held that branch applications to the Board are not required to be determined on the record after opportunity for an agency hearing. In other words, no adjudicatory "hearing" of a quasi-judicial nature is involved. Nothing has been brought to the court's attention to suggest otherwise.
The Board does have mechanisms to assure that it will be able to gather pertinent data, above and beyond what it has available in its own files, to assist it in evaluating the application and deciding the elements, separately and together, which the Regulations specify as the criteria.
Considerable detail is called for on the application to be filed. Notice is given that the application has been filed; this is through various channels likely to reach those interested, as well as by publication. Opportunity is provided to give notice of protest and to file formal protests, as well as to request oral argument where the protest is substantial.
While the rules in regard to submissions carry fixed time limits, the Board is authorized to call for information it believes it needs. Morsemere recognized this at the oral argument, and the matters discussed in the letters received September 2 were allowed to be argued. When Community asked if this new material was to be considered, it was told that had it not been offered, it would have been requested.
Thus, the argument by Morsemere and Fort Lee, that they were deprived of due process when denied an opportunity to respond to data which Community was asked to submit, is without substance. In fact, Community had already dealt with the subject in its filed response when it said that in the event Morsemere opened, and even if its projections were halved, the criteria would be satisfied.
It must not be overlooked that the Board's task involves forecasting. In no case is the historical data available for all the categories up to the moment of application, at oral argument, or even at decision. The gathering, tabulation and disseminating of census data, economic data, institutional data, and the like are time consuming processes. Since the various kinds of data need to be on the same time base for their integration, it is no surprise that a 1977 application will usually have nothing newer than 1976 data.
Consequently, it is idle, as well as destructive of the ability of the Board to perform its expert function expeditiously, to insist on going all the way to "surrebutter", as did pleadings at common law.
Since Board decisions are necessarily based on an evaluation of forecasts, and since forecasts can only be tested when the future has become history, the process cannot *1258 be expected to be precise. The Board is expected to apply its expertise and that of its staff to the data in its own records and supplied by applicants and protestants, and then exercise its best judgment on the data available.
The point is especially significant here because Morsemere was the only party able to supply its own data, the only one that knew what course it intended to follow. Its own application to the State had been allowed in 1974, probably on 1973 data. It could have updated its own figures, to disclose what it judged the deposit potential to be as of 1977 and projected to 1980. It could have indicated what share of that potential it reasonably expected to garner, with and without Community. It was the only one in a position to do so.
Instead, it initially took a position that because it had an inchoate authorization, that fact alone should bar the application. The record shows that Community's estimate was correct, and that Morsemere would not be able to secure space for the site to which the inchoate authority applied. It was at the eleventh hour, just before oral argument, that it was able to obtain another site nearby. It turned out to be a "principal" office in legal contemplation only, but in space, staffing and function not much more than a small branch. Calling it the "principal" office tells the Board nothing about the nature and magnitude of its activity. The Board's function called upon it to evaluate such factors as market share and the effect of competition as matters of fact, and not by label.
Aside from that, there were sets of figures presented over a wide range, some so low as to suggest that the Community branch would not be feasible. From what was presented, the Board had more than enough when taken together with its own experience, records and staff skills, to arrive at a determination within its statutory authority. In fact, with the data presented, the Board was equipped to arrive at its own set of figures, without asking Community to submit further calculations.
The proceeding is non-adversary. The Board is by no means obliged to accept and apply anyone's set of figures. It can arrive at its own.
The most recent ruling in this circuit involving the Board is National State v. Smith, 591 F.2d 223 (CA 3, 1979), but that decision is of no assistance here. That case involved an arrangement by which City Federal, a savings and loan association, was authorized through two downstream subsidiaries, to have the lowest subsidiary obtain a certificate as a national bank with its functions limited to those of the trust department of a commercial bank. Whatever issue there may have been about the authority of the Comptroller of the Currency to issue the limited certificate was mooted when, after argument in the Court of Appeals, the Congress enacted the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L.95-630, section 1504 of which amended 12 U.S.C. § 27 to add a sentence validating such limited certificates retroactively as well as prospectively. See 591 F.2d 223, at 231. Other issues remanded are not pertinent here and there is no further report.[1]
Elsewhere, the rule seems to be universally accepted that a proceeding culminating in a grant by the Board of authority to *1259 open a branch is not an adversary hearing, and that there is no "property right" in existing institutions to be free of competition. In fact, Board policy, as laid down in its Regulations, is to encourage competition.
Under these conditions, the review here is regarded as confined to the question whether the agency decision was arbitrary or capricious, was an abuse of discretion, or otherwise was not in accordance with law. The reviewing court may not substitute its judgment in regard to the merits of the application for that of the Board, so long as the Board's decision has some rational basis.

Guaranty Savings & Loan Ass'n. v. Federal etc. Board, 330 F.Supp. 470 (D-DC, 1971);

Federal etc. Board v. Rowe, 284 F.2d 274 (CA-DC, 1960);

Benton etc. v. Federal etc. Board, 450 F.Supp. 884 (D-Ark., 1978);

First Federal etc. v. Federal etc. Board, 426 F.Supp. 454 (D-Ark.1977), aff'd., 570 F.2d 693 (CA-8, 1978);

Bank of Ozark v. Federal etc. Board, 402 F.Supp. 162 (D-Ark., 1975);

First Nat'l etc. v. Smith, 508 F.2d 1371 (CA-8, 1974);

First Nat'l etc. v. First Federal, etc., 225 F.2d 33 (CA-DC, 1955);

Central Savings, etc. v. Federal etc. Board, 293 F.Supp. 617 (D-Iowa, 1968), aff'd. 422 F.2d 504 (CA-8, 1980);

Mechanics, etc. v. Federal etc. Board, 571 F.2d 582 (CA-6, 1976);

Elm Grove etc. v. Federal etc. Board, 391 F.Supp. 1041 (D.Wisc., 1975);

First Fed. etc. v. Federal etc. Board, 488 F.Supp. 889 (D-Minn., 1980);
It is accordingly clear that the claimed Fifth Amendment issue is a false issue and without substance since there is no "property right" in that sense.
The complaint itself is illuminating. Although Morsemere's board of directors had approved relocation of its authorized but unopened new principal office by resolution at a special meeting of September 21, 1977 (Record, p. 341), and although that office was "opened" before December 2, 1977, the complaint identifies Morsemere as located at 300 Broad Avenue, Palisades Park, N.J., 07650, the original location. This is as of March 2, 1978 when the complaint was filed. The affidavit of Morsemere's president, sworn to March 30, 1978 and filed here the same day, says that he never saw the Board letter forwarding copy of the resolution of approval, mailed December 7, 1977.
The description of office size and functions, Record, pp. 332-337 indicates a rather small facility, with the mortgage department and audit department to remain at the "old" principal office.
All of these, and the history from 1974, speak of a view that Morsemere regarded, and still regards its inchoate paper approval for the Fort Lee office as a species of property that by its very issuance suffices to bar approval to others. Nothing in the law that the court is aware of provides that quality to an unconsummated authorization. The Board policy to encourage competition, dictates otherwise. The Board record is eloquent and clear that Morsemere relied on the issuance of authority to discourage others from acting. Not until Community filed its own application did Morsemere proceed to locate and lease a site, which was not the then approved site, as Community correctly forecast, and it managed to do so on the brink of the oral argument.
Whether or not a Fifth Amendment claim can ever be validly asserted in some context involving authorizations for branches or offices of financial institutions need not be decided here. The circumstances here do not show an interest rising to the level of a property right. The decisions in other contexts relied on by Morsemere on this aspect are decisions involving actual entitlement to one or another benefit upon meeting specified eligibility requirements. Not only do they lack application here, but a trial court is hardly the forum for creating such a drastic alteration in the well-established law governing financial institutions, an alteration which, if valid, would have a broad impact on State regulatory agencies as well as on the Board.
*1260 There being no foundation for a Fifth Amendment claim, the only real issue is whether the record displays a rational basis for the Board's decision. The detailed review of the record summarized above shows that this test is amply met. The unique characteristics of the PMA, of its inhabitants, the remarkable growth in all pertinent economic factors, the conservative nature of the estimates presented, and the unlikelihood that Morsemere's small, last minute office would seriously affect the pattern as a whole, amply support the findings and the decision.

Specification of reasons.
Fort Lee advances the additional argument that the Board's resolution finding that the applicable criteria had been met, is insufficient and that in any event the court must remand the matter to the Board for a statement explaining the basis and the reasons on which the findings are based.
It relies on the decision in City Federal v. Federal etc. Board, 600 F.2d 681 (CA-7, 1979). The court in that case did hold that on the record before it, judgments affirming Board decisions should be vacated because the reasons for the decisions were not explained adequately to permit judicial review. This appears to be the only decision of its kind in the subject field. Defendants point to Madison County etc. v. Federal etc. Board, 622 F.2d 393 (CA-8, 1980), which considered City Federal, concluded that it had incorrectly construed the law, and declined to follow it.
Neither decision is binding here, nor need this court make a selection between them. City Federal itself said:
"We recognize that the administrative record may show so little controversy that the basis of an agency action is obvious from the record, with no need for an express explanation by the agency", citing Camp v. Pitts, 411 U.S. 138, at 143, 93 S.Ct. 1241, at 1244, 36 L.Ed.2d 106 (1973). See 600 F.2d at 689.
Dobrowolsky v. Califano, 606 F.2d 403 (CA-3, 1979) is instructive. That case dealt with the review of HEW decisions denying disability benefits under the Social Security law. The standard of review there, under 42 U.S.C. § 405(g), calls for "substantial evidence" to support the findings of the Administrative Law Judge. The claimant was not represented by counsel, and the record reflected a passive attitude on the part of the ALJ in developing the facts. While the proceeding is non-adversarial in the sense that there is no opponent and that the Administration is supposed to assist the claimant who asserts serious disability, the proceeding is nonetheless an adjudicatory, quasi-judicial process subject to the "substantial evidence" test, rather than the "rational basis" test for a non-adjudicatory and discretionary function such as that of the Board.
It is worth observing, too, that whether the test be that of substantial evidence or of rational basis, and whether or not the agency is called upon to discuss the evidence and explain why some is given more weight than another, and so on, the fact is that on judicial review the court is obliged to undertake its own comprehensive review of the entire administrative record. For reasons nowhere adequately explained that this court is aware of, the test on appeal of the judgment or order of a lower court is whether the result is correct in light of the record, even though the reasons given be wrong; while in some areas of judicial review of administrative decisions, particularly where "substantial evidence" is the test, agency statements are required beyond findings of fact and conclusions of law, and the mental processes involved must be spread on the record. This difference is an unexplained oddity. Nothing of the sort is expected of a jury when it is the fact finder, even on a special verdict.
In any event, even if City Federal were to be accepted here, it would not apply because the detailed review of the administrative record shows so little controversy that the basis for the agency action is obvious from the record, with no need for an express explanation from the agency.
It may be, too, that out of caution, and to provide confidence and assurance to a court undertaking judicial review in fields involving *1261 esoteric subjects, a remand for an express explanation may be desirable as an aid to the reviewing court. Such situations, when they arise, will be ad hoc only, and not such as to warrant a fixed rule to be applied in all cases.
There is danger, too, in cases like this one, that such a remand may subtly involve a reviewing court in a substitution of judgment. The decision here was in November, 1977. It is now nearly 3 years later. The action taken was on the basis of forecast with informed judgment and expertise. The Board now has data, no doubt, of actual experience. If it is to ignore that experience and spell out reasoning as of late 1977, what useful purpose will it serve? If it makes use of actual results, the review will not be testing the same question the Board had in 1977. Many pertinent elements have no doubt changed. For one thing, FSLIC and FDIC insurance has this year been increased from $40,000 to $100,000., just as SIPC has recently increased its insurance to $500,000. Had those 1980 changes been known in advance, as of 1977, would the decision have been the same?
The fuel shortage of 1979 had not occurred when the Board acted. It, and the periodic rise in fuel costs, have had their broad impact on all phases of the economy. Should this be taken into account on a remand?
Such obvious questions make it clear that a remand in this field would not only generate controversy rather than produce clarification, but it would convert an authorization resolution into a short-term permit subject to reconsideration in the light of actual experience.
This is not what the statute and regulations contemplate. An applicant who secures authorization and promptly proceeds to exercise it is inevitably involved in longterm commitments. There is no way to restore the status quo ante.
For each and all of these reasons, the court concludes that no remand for explanation of reasons is warranted.

Other aspects.
At the pretrial conference, Fort Lee "amended" its complaint in intervention to add a claim for money damages. Morsemere indicated it would make a like amendment. There were indications that both would file cross-motions for summary judgment. None of these steps was taken.
The disposition made here, however, decides the underlying basis for all claims adversely to Morsemere and Fort Lee and the other aspects in the case or potentially in the case are accordingly moot, and the judgment will be final as to all parties and all issues.

Conclusion.
The action of the Board had a rational basis, and so was not arbitrary, capricious or contrary to law. There is no Fifth Amendment property right, and no deprivation thereof without due process of law. The basis for the agency decision is so clearly evident from a review of the record as not to warrant a remand for explanation of reasons, whether as an aid to the court or otherwise. Submit judgment accordingly.
NOTES
[1] On November 26, 1980, the Federal Home Loan Bank Board adopted final regulations in respect to the acquisition, exercise and termination of "trust powers" by federal savings and loan associations in general, pursuant to ¶ 403 of the Depositary Institutions Deregulation and Monetary Control Act of 1980.

The text of the proposed regulations appears in 45 Fed.Reg. p. 57728 et seq. (issue of August 29, 1980), and the final regulations appear in 45 Fed.Reg. p. 82162 et seq. (issue of December 15, 1980), to take effect January 1, 1981, as 12 C.F.R. Parts 550 and 571.
As noted in the Supplementary Information, it is the Board's view that federal savings and loan associations are eligible for "the full range of trust powers available to national banks and other institutions", which includes State banks, trust companies or other corporations which come into competition with federal savings and loan associations. See 12 U.S.C. § 1464(n). This footnote is included to bring attention to this recent change of law, not reflected in the National State case.