**MONTGOMERY NATIONAL BANK, Plaintiff,**

v.

**Robert C. CLARKE, et al., Defendants.**

**Civ. No. 88–1022 (CSF).**

United States District Court, D. New Jersey.

Jan. 18, 1989.

E. Robert Levy, Levy, Lybeck, Schwartz & Romankow, P.C., Union, N.J., for plaintiff.

James R. VanHorn, Nat. Westminster Bankcorp of New Jersey, Jersey City, N.J., for defendant First Jersey Nat. Bank/Central.

Carol M. Connelly, Office of the Comptroller of the Currency, Washington, D.C., Irene Dowdy, Asst. U.S. Atty., Trenton, N.J., for defendant Robert Clarke, Comptroller of the Currency.

Barbara S. Goldsmith, Deputy Atty. Gen., Trenton, N.J., for defendant/intervenor Com'r of the New Jersey Dept. of Banking.

OPINION

CLARKSON S. FISHER, District Judge.

Montgomery National Bank ("Montgomery") commenced this action seeking to reverse the decision of the Office of the Comptroller of the Currency of the United States ("OCC") approving the application of The First Jersey National Bank/Central ("First Jersey") to establish a branch at the northeast corner of the intersection of Route 206 and Route 518 in Montgomery Township, New Jersey. Several motions are presently before the court. Both the federal defendant, Robert Clarke, Comptroller of the Currency (the "Comptroller") and the state defendant-intervenor, Mary Little Parell, Commissioner of the New Jer-

sey Department of Banking (the "Commissioner")[1] have moved for summary judgment.[2] Plaintiff, Montgomery National Bank, opposes the summary-judgment motions and simultaneously cross-moves for a *de novo* hearing to determine the validity of the Comptroller's waiver of Montgomery's home-office protection when approving First Jersey's application.

The administrative record (hereinafter referred to as "Admin. Rec.") made by the Comptroller and submitted herein sets forth the undisputed facts giving rise to this lawsuit. On March 13, 1987, First Jersey filed an application with the OCC to establish and operate a branch at the intersection of Routes 206 and 518 in Rocky Hill, New Jersey. As required by statute,[3] First Jersey gave notice of its filing the application by publishing the following legal notice in the Princeton Packet on March 13, 1987:

> Notification is hereby given that The First Jersey National Bank/Central, 200 East State Street, Trenton, New Jersey, 08608, has filed an application with the Comptroller of the Currency on March 13, 1987 ... for permission to establish a domestic branch at Rt. 206 and Rt. 518, Rocky Hill, New Jersey, 08553.
>
> Any person wishing to comment on this application may file comments in writing with the Regional Administrator of National Banks, Northeastern District, Comptroller of the Currency, 1211 Avenue of the Americas, Suite 4250, New York, New York, 10036, within 30 days after the date of this publication.

First Jersey in its initial application did not request a waiver of the home-office protection normally granted to a bank whose principal branch is located in a mu-

---

1. By Order of this court dated October 5, 1988, the Commissioner was granted leave to intervene in this action to address the issue of the constitutionality of N.J.Stat.Ann. § 17:9A–19, which was brought into question by the institution of this lawsuit.

2. First Jersey joins its co-defendants' motions for summary judgment.

3. Section 5.8(a) of the Code of Federal Regulations states, in relevant part:

Except in the case of proposed transactions where more extensive notice is required by statute, the applicant shall publish a notice in a newspaper of general circulation in the community in which the applicant proposes to engage in business. The notice shall state that an application is being filed as of the date of notice, and the notice shall contain the name of the applicant(s) and the subject matter of the application.
12 C.F.R. § 5.8(a) (1988).

nicipality with a population of less than 10,000, because the application was based on the erroneous assumption that the proposed site was located in Rocky Hill borough, which did not contain another bank's home office. On April 22, 1987, Montgomery filed a letter of protest with the OCC seeking a denial, by the Comptroller, of First Jersey's application on the following grounds: (1) improper notice, (2) that approval would be contrary to the public interest, and (3) that approval would violate the provisions of N.J.Stat.Ann. § 17:9A–19.[4] In addition, Montgomery requested oral argument to present its objections further.

In response to Montgomery's objections, First Jersey submitted an addendum to its application, noting that the statute in issue provided for a waiver of home-office protection by the Commissioner of Banking, but stating that a waiver would not be sought because a merger between the New Jersey National Corporation and Montgomery was under way which, if consummated, would render moot the issue of home-office protection. On May 15, 1987, however, Montgomery's shareholders voted to defeat the merger agreement between Montgomery and the New Jersey National Corporation. First Jersey then submitted a further amendment of its application, requesting a waiver of the population requirement for branching into a municipality which serves as a home for another bank's principal office.

In its amendment, First Jersey pointed to the following factors as supplying ample support for the granting of a waiver of home-office protection by the OCC:

(1) An increased competitive environment in Montgomery Township resulting from the establishment of the branch as well as the provision of a banking alternative and access to a wider array of products and services for customers, including trust products and state of the art retail services not offered by the other banks in the area.

(2) First Jersey's intended targeting of a wider geographic market, which would encompass, in addition to the Township of Montgomery, the western portion of Princeton and would draw as customers high tech concerns and larger retail businesses as well as the average consumer.

(3) Increased deposit growth (20%) at the already established banking institutions in the area and consistent population growth within the Township which is evidenced not only by the population statistics but by an increase in the number of building permits from 29 in 1982 to 158 in 1984.

On June 1, 1987, Montgomery submitted another letter of protest to the OCC, reemphasizing the need for home-office protection and refuting First Jersey's contention regarding population growth and the increased competitive environment which would result from the location of a new bank branch in Montgomery Township.

On September 22, 1987, the OCC issued its approval of First Jersey's application, based on its determination that Montgomery had no need for home-office protection and that the public need and convenience would be served by an alternative banking presence in the area. Montgomery instituted the instant action on February 29, 1988. The amended complaint alleges that the decision of the Comptroller was arbitrary, capricious and unreasonable in that the

---

**4.** The Code of Federal Regulations requires any person submitting objections to an application or requesting a hearing to do so within thirty (30) days after the first notice by publication. *See* 12 C.F.R. § 5.10 (1988). Montgomery raises, both as an objection and as a defense to the untimeliness of its own submissions, its contention that First Jersey's publication in the Princeton Packet did not constitute valid notice because it improperly designated the proposed site as being in Rocky Hill when, in fact, it is located in Montgomery Township. The court finds this argument to be wholly without merit.

First, Rocky Hill is a borough located in Montgomery Township which is often used as a geographical designation because it functions as the post-office address for the area. In fact, Montgomery identifies the site of its main office as Rocky Hill on its letterhead. Second, any error initially made by First Jersey was corrected long before the Comptroller rendered his decision and was thus harmless. Furthermore, a review of the administrative record reveals that the OCC did consider Montgomery's objections, despite their untimeliness.

Comptroller failed to address the objections, failed to make findings of fact and conclusions of law and failed to conduct a public hearing or any additional investigation into either the application or the objections, relying instead on information in the public record. The amended complaint further alleges that N.J.Stat.Ann. § 17:9A–19(K) is unconstitutional under both the state and federal constitutions because it lacks an adequate standard for waiving home-office protection and is unconstitutionally vague. Montgomery seeks, as relief, a declaration that N.J.Stat. Ann. § 17:9A–19(K) is void for vagueness and that the waiver of home-office protection in the instant case is contrary to New Jersey law, and an order enjoining the Comptroller from approving an application by First Jersey for a bank branch at the intersection of Rt. 206 and Rt. 518 in Montgomery Township.

The matter is now before the court on defendants' motions for summary judgment. The Comptroller included in his motion a certified copy of the administrative record compiled on the application of First Jersey to open a branch in Montgomery Township. The Comptroller contends that the undisputed facts show that the decision to approve First Jersey's application was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the only grounds on which a district court can reverse the action of the Comptroller. The federal defendant also contends that the New Jersey statute providing for home-office protection—N.J.Stat. Ann. § 17:9A–19(K)—passes constitutional scrutiny under both the federal and state constitutions.[5]

Montgomery does not dispute any of the facts contained within the administrative record. Instead, Montgomery's opposition of the motions for summary judgment is based first on its contention that N.J.Stat. Ann. § 17:9A–19(K) is unconstitutionally vague and lacks adequate standards, and that, in any event, the Comptroller applied the wrong legal standard in granting the waiver. Montgomery also argues, in the alternative, that should the court find the waiver provision of section 17:9A–19(K) to be constitutional and that the Comptroller applied the correct legal standard in waiving home-office protection, summary judgment should still be denied because deficiencies in the administrative record warrant a *de novo* hearing on the validity of the waiver. Last, Montgomery asserts that summary judgment should be denied because the Comptroller's decision was arbitrary, capricious and unreasonable. In addition, Montgomery requests an order compelling the Comptroller to answer certain interrogatories propounded by Montgomery which relate to its contention that the Comptroller's approval of First Jersey's application was arbitrary, capricious and unreasonable.

The Comptroller is the chief officer of the Office of the Comptroller of the Currency, Department of the Treasury. 12 U.S.C. § 1 (1979). As such, he is charged with the administration of the National Bank Act, 12 U.S.C. §§ 21 *et seq.* In furtherance of this, Congress has delegated to the Comptroller the authority to regulate certain activities of national banks, including the authority to investigate and approve or disapprove applications to establish new banks (12 U.S.C. §§ 26–27); to approve or disapprove name changes for national banks (12 U.S.C. § 30); and to investigate and approve or disapprove applications by national banks to establish branches (12 U.S.C. § 36). *See also State Bank of Fargo v. Merchants Nat'l Bank & Trust*, 451 F.Supp. 775, 779 (D.N.D.1978), *aff'd*, 593 F.2d 341 (8th Cir.1979).

The authority of the Comptroller to regulate branch banking is found in 12 U.S.C. § 36, which provides, in part:

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

. . . . .

---

5. The motion for summary judgment filed by the State Commissioner of Banking, defendant-intervenor in this action, addresses only the issue of the constitutionality of N.J.Stat.Ann. § 17:9A–19(K) and requests summary judgment with regard to this issue alone.

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches:

(1) within the limits of the City, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

 In order to effect a "competitive equality" between national and state banks, insofar as branch banking was concerned, Congress imposed a condition in 12 U.S.C. § 36(c) that "a branch may be established only when, where and how state law would authorize a state bank to establish and operate such a branch." *First Nat'l Bank v. Dickinson*, 396 U.S. 122, 130, 90 S.Ct. 337, 341, 24 L.Ed.2d 312 (1969); *First Nat'l Bank of Logan v. Walker Bank*, 385 U.S. 252, 260–61, 87 S.Ct. 492, 496–97, 17 L.Ed.2d 343 (1966). This condition results in incorporating into the National Bank Act the branching limitations of each state where branch banking by national banks located in the respective state is concerned. *Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank*, 554 F.2d 345, 353–54 (8th Cir.), *cert. denied*, 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977). Therefore, since Congress has "entrusted to the States the regulation of branching," *First Nat'l Bank v. Dickinson*, 396 U.S. at 133, 90 S.Ct. at 343, the Comptroller is under a congressional mandate to apply state branching laws when acting upon an application by a national bank to open a branch within a particular state. *Springfield State Bank v. National State Bank of Elizabeth*, 459 F.2d 712, 717 (3d Cir.1972).

The state branching statute brought under fire by this litigation is N.J.Stat.Ann. § 17:9A–19(K). In relevant part, it provides:

A bank or savings bank may establish a full branch office, a minibranch office, or communications terminal branch office anywhere in this State, provided that no bank or savings bank shall ... establish a full branch office or a minibranch office in a municipality, other than that in which it maintains its principal office, which has a population of less than 10,-000, and in which another banking institution maintains its principal office.... *The commissioner, upon application, may set aside the population requirement set forth above for full branch offices or minibranch offices.*

N.J.Stat.Ann. § 17:9A–19(K) (West 1984) (emphasis added). Montgomery concedes that state-law provisions such as the statute set forth above, which regulate bank branching, are made applicable by federal law to national banks. Based on its contention that N.J.Stat.Ann. § 17:9A–19(K) is unconstitutionally vague and bereft of adequate standards, Montgomery contests, however, the application of that part of the statute which authorizes the waiver of Montgomery's home-office protection in approving First Jersey's branch application. Montgomery challenges this delegation of legislative authority to the Commissioner (and, where national banks are concerned, to the Comptroller), without an express standard, as violative of both the federal and state constitutions.

The constitutional ban on vague laws is intended to invalidate statutory enactments which fail to provide adequate notice of their scope and sufficient guidance for their application. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162–63, 92 S.Ct. 839, 843–44, 31 L.Ed.2d 110 (1972); *State v. Cameron*, 100 N.J. 586, 591, 498 A.2d 1217 (1985). The prohibition against vague laws serves several purposes—to ensure that those regulated by the law have proper notice of what is and isn't forbidden; to provide adequate standards for those who enforce the laws; and to protect basic first-amendment freedoms. *Grayned v. City of*

*Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

■ Because the degree of vagueness tolerated under the Constitution depends in part on the nature of the enactment, the determination of vagueness must be made in light of the contextual background of the particular law, with a firm understanding of its purpose. *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *State v. Cameron,* 100 N.J. at 591, 498 A.2d 1217. In this regard, economic regulations are subject to a less strict vagueness test because their "subject matter is often more narrow, and because businesses which face economic demands to plan behavior carefully can be expected to consult relevant legislation in advance of action." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193. It is from this premise that the court begins its examination of N.J.Stat.Ann. § 17:9A–19(K).

Montgomery argues that the statutory scheme in N.J.Stat.Ann. § 17:9A–19(K) represents a legislative determination that home offices in small towns serve a legitimate public purpose and that only by showing that the institution does not function as a true home office can its home-office protection be waived. Moreover, Montgomery contends that the legislative history of New Jersey's laws on branch banking demonstrates a long-standing policy of deference to home-office sites. Montgomery argues, however, that the absence of specific criteria in the statute by which the Commissioner (or, as in this case, the Comptroller) can determine whether a home office is entitled to protection creates an unconstitutionally vague provision which fails to provide guidance to home-office banks regarding what performance is required of them in order to retain their home-office status. Hence, Montgomery seeks a declaration that the waiver provision in N.J.Stat.Ann. § 17:9A–19(K) is unconstitutional under both the federal and state constitutions.

■ It is well settled that the division of power among the branches of state government is not a matter of federal constitutional concern. *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Lombardi v. Tauro,* 470 F.2d 798, 801 (1st Cir.1972), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973); *Women's Health Services, Inc. v. Maher,* 514 F.Supp. 265, 271 (D.Conn.1981). In *Highland Farms Dairy, Inc. v. Agnew,* the Supreme Court, in addressing a challenge to the lawfulness of a state legislature's delegation of the power to regulate milk prices to an agency, stated:

> The Constitution of the United States in the circumstances here exhibited has no voice upon the subject. The statute challenged as invalid is one adopted by a state. This removes objections that might be worthy of consideration if we were dealing with an act of Congress. How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself.

300 U.S. at 612, 57 S.Ct. at 551.

This legal principle encompasses attacks made on the delegation of power by a state legislature to an administrative agency which are based on the broad scope or vague boundaries of that power, and such challenges have been consistently rejected. *See Women's Health Services, Inc. v. Maher, supra.* Thus, there is no merit to Montgomery's argument that N.J.Stat.Ann. § 17:9A–19(K) is an unconstitutionally vague delegation of power under the federal constitution, because such claims are outside the scope of the due-process clause of the fourteenth amendment.

The court will now address the question of whether the delegation of the power to waive home-office protection to the Commissioner is unlawful under the New Jersey state constitution. Of course, in deciding this issue, due deference must be given to those state-law decisions which speak on this subject.

■ The issue of the constitutionality of N.J.Stat.Ann. § 17:9A–19(K) has been addressed only once by the New Jersey state

courts. In *Application of United Counties Trust Co.*, No. A–3732–82T3 (App.Div. 1983) (per curiam), the Appellate Division held that the legislative history of this section, like the Banking Act itself, comprehends a "public interest" standard which repeatedly has been upheld as constitutionally adequate. In reaching its decision, the court rejected the argument that a statute is unconstitutionally vague because the standard is expressed in the legislative history, rather than in the language of the statute itself. Thus, despite the absence of an express statutory standard in the body of the statute, the court held N.J.Stat.Ann. § 17:9A–19(K) to be constitutional and affirmed the Commissioners' waiver of home-office protection. Although *Application of United Counties Trust Co.* is an unpublished opinion, the court finds its reasoning persuasive for the reasons stated below.

Regulation of the conditions and methods by which new financial institutions may be chartered or branches of existing ones created has been committed to the legislative branch of government in New Jersey. *Application of Howard Sav. Inst.*, 32 N.J. 29, 46, 159 A.2d 113 (1960). It is beyond question that, within certain parameters, the New Jersey constitution allows the legislature to delegate its authority to a governmental agency. *Mount Laurel Township v. Public Advocate of New Jersey*, 83 N.J. 522, 532, 416 A.2d 886 (1980). Delegation of legislative powers will survive constitutional scrutiny as long as the discretion of administrative officers is "hemmed in by standards sufficiently definite to guide its exercise." *Id.*, quoting *Cammarata v. Essex County Park Comm'n*, 26 N.J. 404, 410, 140 A.2d 397 (1958). The courts of New Jersey view delegation of legislative powers with a liberal eye and "will not intervene unless the legislative decision is palpably arbitrary." *Shelton College v. State Bd. of Educ.*, 48 N.J. 501, 518, 226 A.2d 612 (1967).

To pass constitutional muster, the standards supporting the legislative delegation of power to an administrative agency need not be express, but may be inferred from the statutory scheme as a whole. *Sheeran v. Nationwide Mut. Ins. Co.*, 80 N.J. 548, 558, 404 A.2d 625 (1979); *Motyka v. McCorkle*, 58 N.J. 165, 177–78, 276 A.2d 129 (1971). In *Schierstead v. City of Brigantine*, the Supreme Court of New Jersey set forth the following rules of construction as appropriate when determining whether sufficient statutory standards are present to circumscribe administrative power:

> In ascertaining the presence of standards and norms to delegated powers, it is fundamental that we are not confined to the four corners of the particular section under consideration but are obligated to examine the entire act in the light of its surroundings and objectives. Nor need the standards be set forth in express terms, if they may reasonably be inferred from the statutory scheme as a whole.

20 N.J. 164, 169, 119 A.2d 5 (1955). In this regard, legislative history is pertinent when construing enactments to determine the legislative plan. *New Jersey Pharmaceutical Ass'n v. Furman*, 33 N.J. 121, 130, 162 A.2d 839 (1960); *Quaglietta v. Haledon*, 182 N.J.Super. 136, 145, 440 A.2d 82 (1981).

Standing alone, N.J.Stat.Ann. § 17:9A–19(K) appears to be lacking the necessary standards to guide the Commissioner when rendering a decision as to the appropriateness of waiving a bank's home-office protection; however, applying the above rules of construction leads the court to conclude that a sufficient standard may reasonably be implied from the statutory scheme of the entire Act, its purpose and the legislative history of the 1981 amendment to N.J.Stat.Ann. § 17:19A–19(K). The overall objective of the Banking Act of 1948 is to achieve a sound banking structure which enjoys competitive health and adequately provides for the needs of the community. *Elizabeth Fed. Sav. & Loan Ass'n v. Howell*, 30 N.J. 190, 194, 152 A.2d 359 (1959). The emphasis throughout the Banking Act is on the benefit to the public, and not the particular interest of a banking institution, whether it be the applicant or the previously-established objector. *Appli-*

*cation of Howard Sav. Inst.*, 32 N.J. 29, 40, 159 A.2d 113 (1960).

The language of the banking laws clearly directs that the "interests of the public" is the principal test to be applied by the Commissioner, whether passing on charters for new banks or approving applications for establishing branches or changes in location. *Application of Howard Sav. Inst., supra.* Thus, the Commissioner must determine that the interest of the public will be served to advantage and that the proposed locality affords a reasonable promise of successful operation before approving an application to charter a new bank (N.J. Stat.Ann. § 17:9A–11(D)(1), (2)); that the convenience and needs of the public will be served to advantage before permitting the establishment of a bank branch (N.J.Stat. Ann. § 17:9A–20(B)(1)); and that the interests of the public will be served to advantage before approving a location change for a bank (N.J.Stat.Ann. § 17:9A–22(C)).

The court finds that the legislature intended that the same standard guide the Commissioner in determining whether to waive home-office protection and permit the establishment of a branch in a municipality which has a population of less than 10,000, and which serves as a home office for another bank. This result is further supported by the legislative history of the 1981 amendment to N.J.Stat.Ann. § 17:9A–19(K). Prior to 1981, the legislature placed an absolute ban on the establishment of full branches in communities in which another bank maintained its principal office and which had populations under a specified number. In 1981, the legislature amended the statute, retaining home-office protection in municipalities with populations under 10,000, but authorizing the Commissioner to waive the population requirement. Although the amendment itself did not provide an express standard, the Assembly Banking and Insurance Committee Statement to the Senate provides the necessary guidance. In relevant part, it states:

> This legislation, amending section 19 of the Banking Act of 1948 ... provides that the Commissioner of Banking may permit the establishment of a full branch office or minibranch office in any municipality, notwithstanding the statutory prohibition of such offices in municipalities with a population of 10,000 in which another banking institution maintains its principal office.
>
> ....
>
> This legislation would permit the establishment of electronic terminals ... in towns with a population of less than 10,000, and it would permit the Commissioner to override the statutory prohibitions against other types of branches as well, *if he decides that the establishment of such banks is in the public interest.*

1981 N.J.Sess.Law Serv. Vol. 1, p. 46 (West) (emphasis added).

Thus, the court concludes that the legislature intended that the "public interest" standard be applied in deciding when to waive home-office protection. The legislative history of the statute unequivocally states this, and the language of the Banking Act clearly indicates that the legislature intended that the "public interest" be the primary consideration in all areas of banking regulation by the repeated use of this standard throughout its various provisions. The court recognizes that the standard is a broad one; however, New Jersey courts have uniformly upheld it as constitutional notwithstanding its general terms. *See Mount Laurel Township v. Public Advocate of New Jersey*, 83 N.J. at 532, 416 A.2d 886; *Elizabeth Fed. Sav. & Loan Ass'n v. Howell*, 30 N.J. at 194, 152 A.2d 359. This court defers to their well-reasoned judgment in interpreting state law under the state constitution and concludes that N.J.Stat.Ann. § 17:9A–19(K) does not violate the New Jersey state constitution.

■ The Comptroller based his decision on three considerations: (1) that the establishment of a branch in Montgomery Township was in the best interest of the public need and convenience; (2) that First Jersey showed a reasonable promise of success at this location; and (3) that the presence of the new branch would not adversely impact on Montgomery's financial health. (Admin. Rec. at 2–5.) Montgomery next argues

that the Comptroller erred in using the "public interest" standard because, pursuant to N.J.Stat.Ann. § 17:9A–20, this standard applies to all branch applications in New Jersey, and if the legislature had intended that the standard for the waiver of home-office protection and the standard for establishing new branches in general be identical, it would have eliminated the population requirement altogether.

The court disagrees. While the language of a standard may be similar, or even identical, the considerations applied in reaching a determination are not the same in different settings. The legislature has announced a broad standard to be used by the Commissioner in regulating banking in this state; however, the regulatory context in which it is to be applied will contribute its own particular setting. *Keyes Martin & Co. v. Director, Div. of Purchase and Property,* 99 N.J. 244, 256, 491 A.2d 1236 (1985).

In further support of its contention that the wrong legal standard was applied, Montgomery asserts that the legislative purpose of the waiver provision was to protect small banks and that before granting a waiver, the Commissioner must find either that the objecting bank's principal office does not serve as a true home office or that the main office does not serve the needs of the municipality and, consequently, is undeserving of home-office protection. Under Montgomery's interpretation of the Banking Act, the Commissioner should focus on the needs and performance of the established bank, rather than the public interest, in passing on another bank's branch application when approval requires a waiver of home-office protection.

Montgomery clearly misunderstands the objectives sought by the Banking Act. As noted earlier, the entire Act seeks the achievement of a sound banking structure which adequately serves the needs of the community. *Elizabeth Fed. Sav. & Loan Ass'n v. Howell,* 30 N.J. at 194, 152 A.2d 359. Rather than focusing on the interests of individual banking institutions, the emphasis throughout the Banking Act is on the benefit to the public. *Application of*

*Howard Sav. Inst.,* 32 N.J. at 40, 159 A.2d 113. Nothing in the legislative history of the banking laws, quoted at length by Montgomery in its papers, persuades this court to the contrary. Instead, the evolution of the branching laws, from an absolute prohibition on branching outside the county in which the main office of a bank was located to the present provision for a limited home-office protection, shows a clear trend away from protecting the interests of individual banks and towards encouraging greater competition between banking institutions.

More significantly, the legislative history of section 17:9A–19(K) explicitly states that the Commissioner should waive home-office protection when it is in the interest of the public to do so. *See* Assembly Banking and Insur. Comm. Statement to the Senate, 1981 N.J.Sess.Law Serv. Vol. 1, p. 46 (West). There is nothing in the legislative history to support Montgomery's contention that only if the established bank does not function as a true home office, can the applicant obtain a waiver. Clearly, the public-interest standard was correctly applied by the Commissioner in the instant case.

Finally, Montgomery argues that the Comptroller, in waiving the home-office protection provided by the statute and approving First Jersey's branch application, utilized a factfinding procedure which was inadequate because of the Comptroller's failure to hold a hearing or conduct an investigation into certain factors which Montgomery deems essential to such a determination, and rendered a decision which was arbitrary, capricious and unreasonable. Thus, Montgomery opposes summary judgment and requests that this court hold a *de novo* hearing to determine the validity of the Comptroller's decision to waive home-office protection.

The Standard of Review

■ Before addressing the merits of Montgomery's request for a *de novo* hearing, a threshold issue—the appropriate standard for judicial review of the Comptroller's decision—must be resolved. It is now well settled that a decision by the

Comptroller to authorize branching by a national bank is a proper subject for judicial review under section 706(2)(A) of the Administrative Procedure Act (the "APA").[6] *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 156–58, 90 S.Ct. 827, 831–32, 25 L.Ed.2d 184 (1970); *First Bank and Trust Co. v. Smith,* 509 F.2d 663, 665 (1st Cir.1975). In *Camp v. Pitts,* the Supreme Court clearly set forth the limited role of a reviewing court, under section 706(2)(A), when addressing a challenge to the Comptroller's decision:

> Unquestionably, the Comptroller's action is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701.... But it is clear that neither the National Bank Act nor the APA requires the Comptroller to hold a hearing or make formal findings on the record when passing on applications for new banking authorities.... Accordingly, the proper standard for judicial review of the Comptroller's adjudications is not the "substantial evidence" test which is appropriate when reviewing findings made on a hearing record.... Nor was the reviewing court free to hold a *de novo* hearing under § 706(2)(F) and thereafter determine whether the agency action was "unwarranted by the facts." ... [*D*]e novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.... The appropriate standard for review was, accordingly, whether the Comptroller's adjudication was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ... In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.

6. Section 706(2)(A) of the Administrative Procedure Act provides, in pertinent part:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret ... statutory provisions, and determine the terms of an agency action. The reviewing court shall—

411 U.S. 138, 140–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (citations omitted).

■ In its attempt to persuade this court to conduct a *de novo* review of the Comptroller's decision, Montgomery seizes upon certain dicta in *Camp v. Pitts,* in which the Supreme Court states "that *de novo* review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding," 411 U.S. at 142, 93 S.Ct. at 1244, and asserts that this action falls within this exception to the prohibition against *de novo* review. As a basis for this assertion, Montgomery proffers the Comptroller's failure to grant Montgomery the opportunity to present its objections and conduct a cross-examination of the applicant; the Comptroller's failure to make findings of fact and conclusions of law in rendering his decision; and the Comptroller's failure to investigate certain factors, such as Montgomery's performance as a home office, the size and character of the trade area, and the adverse effect another branch would have on the other banking institutions in the area. Despite Montgomery's characterization of the instant action as a challenge to the factfinding procedures of the Comptroller, however, this court is not persuaded that a *de novo* review of the Comptroller's decision is necessary or even appropriate in this case.

■ First, Montgomery's contention that the administrative record is deficient because the Comptroller failed to hold a hearing at which Montgomery could present its objections and cross-examine First Jersey executives clearly has no merit. With regard to requests for a hearing, section 5.10 of the Code of Federal Regulations provides, in relevant part:

(1) Within 30 days after notice by publication required by § 5.8(a) ... any per-

. . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
5 U.S.C. § 706(2)(A) (1977).

son may submit to the Director for Analysis or Director for Multinational and Regional Bank Supervision a written request for a hearing on an application. (2) *The request shall state the nature of the issues or facts to be presented and the reasons why written submissions would be insufficient to make an adequate presentation to the Office.* If the reasons are related to factual disputes, the disputes shall be described. Hearings are not forums for legal arguments. Comments challenging the legality of an application should be submitted separately in writing. (3) Written requests for hearings ... shall be evaluated by the Director for Analysis or Director for Multinational and Regional Bank Supervision, who may grant or deny such requests in whole or in part.... *A hearing request shall be granted only if it is determined that written submissions would be inadequate or that a hearing would otherwise be beneficial to the decision making process.* A hearing may be limited to issues considered material by the Office.

12 C.F.R. § 5.10 (1988) (emphasis added). The language of this rule plainly leaves the decision to grant or deny a hearing to the discretion of the Comptroller. Moreover, in *Camp v. Pitts, supra*, the Supreme Court unequivocally held that neither the National Banking Act nor the APA requires the Comptroller to hold a hearing on the record and thus laid this issue to rest. As a result, the courts have consistently rejected challenges to actions of the Comptroller based on a denial of a request for a formal hearing. *See Bank of North Shore v. Fed. Deposit Ins. Corp.*, 743 F.2d 1178, 1183–84 (7th Cir.1984); *First Bank and Trust Co. v. Smith*, 509 F.2d at 665.

The instant case provides no basis for an exception. In addition to being untimely, the objections submitted by Montgomery failed to state reasons why written submissions would be insufficient to make an adequate presentation to the Office, as required by 12 C.F.R. § 5.10(b)(2). Since Montgomery failed to meet this burden, the court concludes that the Comptroller did not abuse its discretion in failing to conduct a hearing on First Jersey's application. Furthermore, the lack of an opportunity to cross-examine the applicant does not present a procedural due-process problem. The function of a public hearing in branch-application proceedings in the OCC is to gather facts, not to provide an adversarial, trial-type adjudication after which findings of fact are made. *First Nat'l Bank of Fairbanks v. Camp*, 465 F.2d 586, 604 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 256 (1973); *First–Citizens Bank and Trust v. Camp*, 409 F.2d 1086, 1090 (4th Cir.1969). Hence, even if the Comptroller had granted Montgomery a hearing, due process would not have required that Montgomery be afforded the opportunity to cross-examine First Jersey witnesses.

Second, in arguing that the failure of the Comptroller to make findings of fact and conclusions of law or to conduct a separate investigation outside of the administrative record warrants a *de novo* hearing in this court, Montgomery misconstrues both the letter and the spirit of *Camp v. Pitts*. There, the Supreme Court explicitly rejected the contention that the Comptroller is required to make express findings of fact. 411 U.S. at 140, 93 S.Ct. at 1243; *City Nat'l Bank v. Smith*, 513 F.2d 479, 485 (D.C.Cir.1975). More importantly, the Court announced a doctrine of judicial restraint with regard to review of the Comptroller's decisions on branching applications. A district court's focus on review is set only on the administrative record already in existence, and its inquiry is limited to determining whether some rational basis exists within that record to support the Comptroller's decision. *Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. at 1244; *First Nat'l Bank of Crown Point v. Camp*, 463 F.2d 595, 599–600 (7th Cir.1972).

■ Should a review of the administrative record reveal a paucity of administrative explanation or the failure to address pertinent issues, such that effective judicial review is frustrated, the proper remedy is still not a *de novo* review in this court. *Camp v. Pitts, supra*. Instead, the appro-

priate procedure to be followed is to remand the matter to the Comptroller for a further explanation of the basis for his decision or, where appropriate, supplementation of the record. *Camp,* 411 U.S. at 143, 93 S.Ct. at 1244; *Madison County Bldg. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 622 F.2d 393, 396 (8th Cir.1980) (further explanation may be required if the bare record does not disclose the factors considered by the agency or its construction of the evidence).

■ Equally inappropriate, even in the face of an inadequate administrative record, is the granting of discovery in order to flesh out the facts relied upon by the decision makers in an agency determination. *Bank of Commerce of Laredo v. City Nat'l Bank of Laredo,* 484 F.2d 284, 287 (5th Cir.1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974) (the preponderant weight of judicial precedent bars plaintiffs from deposing the Comptroller or requiring him to answer interrogatories); *Elm Grove Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.,* 391 F.Supp. 1041, 1043 (E.D.Wis.1975); *National Petroleum Refiners Ass'n v. Fed. Trade Comm.,* 392 F.Supp. 1052, 1054 (D.D.C.1974). Since *Camp v. Pitts* requires that a final agency decision, reviewed under the arbitrary-and-capricious standard, stand or fall on the basis of the administrative record, resort to extraneous information is both unnecessary and unwarranted. 411 U.S. at 143, 93 S.Ct. at 1244; *see also Morsemere Sav. & Loan Ass'n v. Marston,* 500 F.Supp. 1253, 1254 (D.N.J.1980) (on a review under § 706 or where there is no trial *de novo,* the only facts in the case consist of those in the administrative record).

■ Last, Montgomery's contention that *de novo* review is necessary because the Comptroller failed to investigate certain factors such as Montgomery's performance as a home office, the size and character of the trade area and the adverse effect another branch would have on Montgomery is unsupported by the facts as well as the law. Whether Montgomery's Rocky Hill office truly operates as a home office

relates to the proper standard to be applied in deciding a waiver issue. As concluded earlier in this opinion, the appropriate standard in these circumstances is the "public interest" standard; consequently, Montgomery's performance as home office is irrelevant for the purpose of deciding whether to waive home-office protection.

Nor is there anything in the waiver provision itself or the legislative history of the statute which supports Montgomery's assertion that the Comptroller must assess the character and size of the trade area to be served in every case. As support for this assertion, Montgomery relies on *Application of Howard Sav. Inst.,* which held that a determination of probable success or the public interest in the establishment of a new branch should not be confined to the artificial limits of political boundaries but should extend to the general area to be served. 32 N.J. at 43, 159 A.2d 113. Rather than support Montgomery's argument, however, this decision undermines it. It is apparent that the Comptroller accepted as credible First Jersey's assertion that its targeted market would extend to Princeton Township and would include large commercial businesses in addition to offering added trust services to those consumers in the Montgomery Township area. In light of the Comptroller's role as trier of fact in this action, the weight and credibility of the evidence was for his determination and the court will not substitute its own judgment for his. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *First Nat'l Bank of Fayetteville v. Smith,* 508 F.2d 1371, 1378 (8th Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).

Finally, Montgomery's contention that the Comptroller failed to investigate the adverse effect another branch would have on Montgomery is completely contradicted by the record. The OCC studied the effect which the First Jersey branch would have on Montgomery's financial stability and expressly found that no adverse effect would result from the presence of an additional banking facility in the area. (Admin.Rec.

at 3.) Accordingly, Montgomery's cross-motion for a trial *de novo* and to compel the Comptroller to answer its interrogatories is denied.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Brown v. Hilton*, 492 F.Supp. 771, 774 (D.N.J.1980). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This "burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Nonetheless, in deciding a motion for summary judgment, the facts and inferences therefrom are construed in a light most favorable to the nonmoving party. *Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

The above summary judgment standards are equally applicable in actions which bring the administrative action of the Comptroller under review. *State Bank of Fargo v. Merchants Nat'l Bank & Trust*, 451 F.Supp. at 779. Since Montgomery has no right to a trial *de novo*, this case is ripe for summary judgment. *See First Nat'l Bank of Fayetteville v. Smith*, 508 F.2d at 1374; *Bank of Commerce of Laredo v. City Nat'l Bank of Laredo*, 484 F.2d at 289; *Maplewood State Bank v. Comptroller of the Currency*, 510 F.Supp. 1054, 1057 (D.Minn.1981). The court may reverse the Comptroller's decision and enjoin him from granting approval of First Jersey's branch in Montgomery Township only if the court finds from the record as whole that the action of the Comptroller is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Camp v. Pitts, supra*. This inquiry involves only matters of law. *First Nat'l Bank of Fayetteville v. Smith, supra; Maplewood State Bank v. Comptroller of the Currency, supra*.

As noted earlier, a review under the arbitrary-and-capricious standard is a narrow one. *Camp v. Pitts, supra; Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823; *Morsemere Sav. & Loan A'ssn. v. Marston*, 500 F.Supp. at 1257. Administrative action is deemed arbitrary and capricious only where no rational basis can be found in the record to support it. *First Nat'l Bank of Fayetteville v. Smith*, 508 F.2d at 1376; *Carlisle Paper Box Co. v. NLRB*, 398 F.2d 1, 6 (3d Cir.1968); *State Bank of Fargo v. Merchants Nat'l Bank & Trust*, 451 F.Supp. at 786. A finding of something more than mere error in judgment must be made to reverse the Comptroller's decision. *Id.* Parties challenging the Comptroller's action have the heavy burden of proving that it was "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *First Nat'l Bank of Fayetteville v. Smith, supra, quoting* 73 C.J.S. Public Administrative Bodies and Procedure § 209 at 569 (1951).

Montgomery has failed to meet this burden. The Comptroller clearly articulated his reasons for approving First Jersey's application. The decision of the Comptroller was based on a finding by the OCC that it would be in the best interest of the public to have a banking alternative in Montgomery Township which would increase the competitive environment and provide added retail services and trust products not presently offered by other banks. (Admin. Rec. at 2). This result was reached only after a review of the application was performed by a number of OCC officials including the Assistant National Bank Examiner, the Director and Manager of Corporate Analysis and the Director of Analysis. (Admin. Rec. at 5).

Certainly, evidence exists within the record which provides a rational basis for the Comptroller's decision. In its analysis of First Jersey's application, the OCC clearly accorded great weight to First Jersey's submissions regarding the market it would target and the added products it would offer both hightech concerns and the aver-

age consumer. (Admin. Rec. at 38–40). Furthermore, the OCC did investigate First Jersey's financial stability to determine its probability of success. (Admin. Rec. at 3.) If evidence existed which shed doubt on First Jersey's status as a multi-billion dollar organization (Admin. Rec. at 39) or its ability to provide the promised services, this would have been disclosed by the studies performed by the OCC.

Nor is there any basis for Montgomery's contention that the OCC failed to consider the home-office protection issue. The administrative record is replete with references to N.J.Stat.Ann. § 17:19A–19(K) and the need to consider the issue of waiving Montgomery's home-office protection. (Admin. Rec. at 3–5 16, 17, 29.) The financial condition of Montgomery was determined and the OCC concluded that it did not need home-office protection, and would not be adversely affected by the establishment of a new branch. (Admin. Rec. at 3, 5). Moreover, the OCC also concluded that the sharp rise in residential building permits indicated a healthy population growth and since the estimated population in 1984 was 7,800, it would be only a matter of time before the 10,000 parameter was reached. (Admin. Rec. at 2–3).

The record shows that the OCC did consider and address Montgomery's objections; however, it obviously gave more weight to the evidence submitted by First Jersey. It is well settled that it is not the function of this court to independently weigh the evidence and substitute its own judgment for that of the Comptroller. *First Nat'l Bank of Fayetteville v. Smith*, 508 F.2d at 1378; *Morsemere Sav. & Loan Ass'n v. Marston*, 500 F.Supp. at 1259; *Security Bank and Trust Co. v. Heimann*, 452 F.Supp. 776, 781 (M.D.N.C.1978). Unless a review of the administrative record fails to disclose a rational basis for the Comptroller's decision, this court must defer to the administrative agency's expertise and broad discretion in these matters. *Id.*

The court is convinced that the administrative record provides an adequate basis for the Comptroller's conclusion that the establishment of a new branch by First Jersey in Montgomery Township would serve the public interest and that Montgomery would not be placed in jeopardy by the additional competition. Certainly, the explanation provided in the record far surpasses the terse explanation accepted by the Supreme Court in *Camp v. Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244. Since a rational basis exists within the record for waiving home-office protection, the Comptroller's decision cannot be deemed arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and hence, must be affirmed.

Accordingly, summary judgment dismissing the complaint is granted in favor of the Comptroller and the Commissioner of Banking, and Montgomery's motion for a *de novo* hearing and to compel the Comptroller to answer interrogatories is denied. An order accompanies this opinion. No costs.